*PRELIMINARY PRINT*

VOLUME 598 U. S. PART 2

PAGES 771–815

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 1, 2023

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# GLACIER NORTHWEST, INC., DBA CALPORTLAND *v.* INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL UNION NO. 174

## CERTIORARI TO THE SUPREME COURT OF WASHINGTON

No. 21–1449. Argued January 10, 2023—Decided June 1, 2023

Glacier Northwest delivers concrete to customers in Washington State using ready-mix trucks with rotating drums that prevent the concrete from hardening during transit. Concrete is highly perishable, and even concrete in a rotating drum will eventually harden, causing significant damage to the vehicle. Glacier's truck drivers are members of the International Brotherhood of Teamsters Local Union No. 174. After a collective-bargaining agreement between Glacier and the Union expired, the Union called for a work stoppage on a morning it knew the company was in the midst of mixing substantial amounts of concrete, loading batches into ready-mix trucks, and making deliveries. The Union directed drivers to ignore Glacier's instructions to finish deliveries in progress. At least 16 drivers who had already set out for deliveries returned with fully loaded trucks. By initiating emergency maneuvers to offload the concrete, Glacier prevented significant damage to its trucks, but all the concrete mixed that day hardened and became useless.

Glacier sued the Union for damages in state court, claiming that the Union intentionally destroyed the company's concrete and that this conduct amounted to common-law conversion and trespass to chattels. The Union moved to dismiss Glacier's tort claims on the ground that the National Labor Relations Act (NLRA) preempted them. While a federal law generally preempts state law when the two conflict, the NLRA preempts state law even when the two only *arguably* conflict. *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 245. In the Union's view, the NLRA—which protects employees' rights "to self-organization, to form, join, or assist labor organizations, . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," 29 U. S. C. § 157—at least arguably protected the drivers' conduct, so the State lacked the power to hold the Union accountable for any of the strike's consequences. The Washington Supreme Court agreed with the Union, reasoning that "the NLRA preempts Glacier's tort claims related to the loss of its concrete product because that loss was incidental to a strike arguably protected by federal law."

*Held*: The NLRA did not preempt Glacier's tort claims alleging that the Union intentionally destroyed the company's property during a labor dispute.   Pp. 779–785.

(a) The parties agree that the NLRA protects the right to strike but that this right is not absolute.   The National Labor Relations Board has long taken the position—which the parties accept—that the NLRA does not shield strikers who fail to take "reasonable precautions" to protect their employer's property from foreseeable, aggravated, and imminent danger due to the sudden cessation of work.   *Bethany Medical Center*, 328 N. L. R. B. 1094.   Given this undisputed limitation on the right to strike, the Court concludes that the Union has not met its burden as the party asserting preemption to demonstrate that the NLRA arguably protects the drivers' conduct.   *Longshoremen* v. *Davis*, 476 U. S. 380, 395.   Accepting the complaint's allegations as true, the Union did not take reasonable precautions to protect Glacier's property from imminent danger resulting from the drivers' sudden cessation of work. The Union knew that concrete is highly perishable, that it can last for only a limited time in a delivery truck's rotating drum, and that concrete left to harden in a truck's drum causes significant damage to the truck. The Union nevertheless coordinated with truck drivers to initiate the strike when Glacier was in the midst of batching large quantities of concrete and delivering it to customers.   The resulting risk of harm to Glacier's equipment and destruction of its concrete were both foreseeable and serious.   The Union thus failed to "take reasonable precautions to protect" against this foreseeable and imminent danger.   *Bethany Medical Center*, 328 N. L. R. B., at 1094.   Indeed, far from taking reasonable precautions, the Union executed the strike in a manner designed to achieve those results.   Because such conduct is not arguably protected by the NLRA, the state court erred in dismissing Glacier's tort claims as preempted. Pp. 779–782.

(b) The Union's efforts to resist the conclusion that the NLRA does not arguably protect its conduct are unavailing.   First, the Union emphasizes that the NLRA's protection of the right to strike should be interpreted generously.   But the protected right to strike is not absolute, thus the Court must analyze whether the strike exceeded the limits of conduct protected by the statute.

Second, the Union argues that workers do not forfeit the NLRA's protections simply by commencing a work stoppage when the loss of perishable products is foreseeable, but this case involves much more than that.   Given the lifespan of wet concrete, Glacier could not batch it until a truck was ready to take it.   By reporting for duty and pretending as if they would deliver the concrete, the drivers prompted the

creation of the perishable product. Then, they waited to walk off the job until the concrete was mixed and poured in the trucks. In so doing, they not only destroyed the concrete but also put Glacier's trucks in harm's way.

Third, the Court acknowledges that the Union's decision to initiate the strike during the workday and failure to give Glacier specific notice do not themselves render the Union's conduct unprotected. Still, these actions are relevant considerations in evaluating whether strikers took reasonable precautions, whether harm to property was imminent, and whether that danger was foreseeable. See *International Protective Services, Inc.*, 339 N. L. R. B. 701, 702–703. Here, the Union's choice to call a strike after its drivers had loaded a large amount of wet concrete into Glacier's delivery trucks strongly suggests that it failed to take reasonable precautions to avoid foreseeable, aggravated, and imminent harm to Glacier's property.

Finally, while the Union maintains that the drivers took some steps to protect the trucks, the Union concedes that the NLRA does not arguably protect its actions if those actions posed a material risk of harm to the trucks. Given that Glacier alleges that the Union took affirmative steps to endanger Glacier's property rather than reasonable precautions to mitigate that risk, the NLRA does not arguably protect the Union's conduct. Pp. 782–784.

198 Wash. 2d 768, 500 P. 3d 119, reversed and remanded.

BARRETT, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, and KAVANAUGH, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment, in which GORSUCH, J., joined, *post*, p. 785. ALITO, J., filed an opinion concurring in the judgment, in which THOMAS and GORSUCH, JJ., joined, *post*, p. 788. JACKSON, J., filed a dissenting opinion, *post*, p. 789.

*Noel J. Francisco* argued the cause for petitioner. With him on the briefs were *Anthony J. Dick* and *Matthew J. Rubenstein.*

*Vivek Suri* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Prelogar, Deputy Solicitor General Kneedler, Jennifer A. Abruzzo, Nancy E. Kessler Platt, Ruth E. Burdick, David Habenstreit,* and *Dawn L. Goldstein.*

Opinion of the Court

*Darin M. Dalmat* argued the cause for respondent. With him on the brief were *Dmitri Iglitzin, Kathleen Phair Barnard, Ben Berger, Easha Anand,* and *Pamela S. Karlan.**

JUSTICE BARRETT delivered the opinion of the Court.

Glacier Northwest, a concrete company, depends on its truck drivers to deliver concrete to customers in a timely manner. But when relations between Glacier and its drivers soured, the drivers went on strike. Their labor union allegedly designed the strike with the intent to sabotage Glacier's

*Briefs of *amici curiae* urging reversal were filed for the Buckeye Institute by *Jay R. Carson, Robert Alt,* and *David C. Tryon*; for the Chamber of Commerce of the United States of America by *Carter G. Phillips*; for the Coalition for a Democratic Workplace by *Steven P. Lehotsky, Adam Steene,* and *Andrew B. Davis*; for the Landmark Legal Foundation by *Matthew C. Forys, Michael J. O'Neill,* and *Richard P. Hutchison*; and for the National Right to Work Legal Defense Foundation, Inc., by *Glenn M. Taubman* and *Alyssa K. Hazelwood.*

Briefs of *amici curiae* urging affirmance were filed for the State of Washington et al. by *Robert W. Ferguson,* Attorney General of Washington, *Noah G. Purcell,* Solicitor General, *Peter B. Gonick,* Deputy Solicitor General, and *Kate S. Worthington,* Assistant Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Philip J. Weiser* of Colorado, *William Tong* of Connecticut, *Karl A. Racine* of the District of Columbia, *Kwame Raoul* of Illinois, *Aaron M. Frey* of Maine, *Maura Healey* of Massachusetts, *Dana Nessel* of Michigan, *Keith Ellison* of Minnesota, *Aaron D. Ford* of Nevada, *Matthew J. Platkin* of New Jersey, *Letitia James* of New York, *Ellen F. Rosenblum* of Oregon, *Josh Shapiro* of Pennsylvania, *Peter F. Neronha* of Rhode Island, and *Josh Kaul* of Wisconsin; for Administrative Law Professors et al. by *Stacey M. Leyton*; for the American Federation of Labor and Congress of Industrial Organizations by *Harold C. Becker* and *James B. Coppess*; for the Constitutional Accountability Center by *Elizabeth B. Wydra* and *Brianne J. Gorod*; for Tort Scholars by *John R. Mooney, Aaron Streepy,* and *Mark Geistfeld* and *Sheila L. Birnbaum,* both *pro se*; for Unite Here International et al. by *Richard G. McCracken* and *Paul L. More*; for the United Brotherhood of Carpenters and Joiners of American et al. by *David C. Frederick, Scott K. Attaway Matthew F. Capece, Daniel M. Shanley,* and *Nicole G. Berner*; and for Matthew Bodie et al. by *Jacob Karabell,* and *Charlotte Garden* and *Catherine Fisk,* both *pro se.*

property.   Although Glacier managed to avoid damage to its delivery trucks by deploying emergency maneuvers, the concrete that it had already produced that day went to waste. Glacier sued the union in state court for destroying its property.   But the company did not get very far: The state court dismissed Glacier's tort claims on the ground that they were preempted by the National Labor Relations Act.   We reverse.

## I

### A

Enacted in 1935, the National Labor Relations Act (NLRA) "encourag[es] the practice and procedure of collective bargaining" between labor and management to resolve "industrial disputes arising out of differences as to wages, hours, or other working conditions."   49 Stat. 449, 29 U. S. C. §151.   Section 7 of the NLRA protects employees' rights "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."   §157.   Section 8, in turn, prohibits employers and unions from engaging in certain "unfair labor practice[s]," such as interfering with employees' exercise of their §7 rights.   §§158(a), (b).

To enforce the NLRA, Congress created the National Labor Relations Board.   The Board is authorized "to prevent any person from engaging in any unfair labor practice" that "affect[s] commerce."   §160(a).   Its authority kicks in when a person files a charge with the agency alleging that an unfair labor practice is afoot.   29 CFR §101.2 (2021). Agency staff investigate the charge, and if it "appears to have merit," the agency issues a complaint against the offending party.   §§101.4, 101.8.   After taking evidence and conducting a hearing, the Board makes the final call.   29 U. S. C. §§160(b), (c); see also 29 CFR §§101.10–101.12.   If it determines that a party has engaged in an unfair labor

practice, the Board orders it to "cease and desist" from that practice. 29 U. S. C. § 160(c). The Board may seek enforcement of its order in a federal court of appeals. § 160(e). And a party aggrieved by the order may ask the court to set it aside. § 160(f).

B

Sometimes a party to a labor dispute goes directly to a court—raising the specter that state law will say one thing about the conduct underlying the dispute while the NLRA says another. It is a bedrock rule, of course, that federal law preempts state law when the two conflict. U. S. Const., Art. VI, cl. 2. Preemption under the NLRA is unusual, though, because our precedent maintains that the NLRA preempts state law even when the two only *arguably* conflict. *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 245 (1959) ("When an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board"). This doctrine—named *Garmon* preemption after the case that originated it—thus goes beyond the usual preemption rule. Under *Garmon*, States cannot regulate conduct "that the NLRA protects, prohibits, or arguably protects or prohibits." *Wisconsin Dept. of Industry* v. *Gould Inc.*, 475 U. S. 282, 286 (1986).

Though broad, this standard has teeth. *Longshoremen* v. *Davis*, 476 U. S. 380, 394 (1986) ("The precondition for preemption, that the conduct be 'arguably' protected or prohibited, is not without substance"). It requires more than "a conclusory assertion" that the NLRA arguably protects or prohibits conduct. *Ibid.* "[A] party asserting pre-emption must advance an interpretation of the [NLRA] that is not plainly contrary to its language and that has not been 'authoritatively rejected' by the courts or the Board." *Id.*, at 395. The party must then "put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation." *Ibid.*

Opinion of the Court

If the court determines that the party has met its burden
to show that "there is an arguable case for pre-emption," it
generally must grant the party's preemption defense and
await the Board's resolution of the legal status of the rele-
vant conduct. *Id.*, at 397.[1]  After that, "only if the Board
decides that the conduct is not protected or prohibited [by
the NLRA] may the court entertain the litigation." *Ibid.*
"[W]hen properly invoked," *Garmon* thus "tells us not just
what law applies (federal law, not state law) but who applies
it (the National Labor Relations Board, not the state courts
or federal district courts)." *Trollinger* v. *Tyson Foods, Inc.*,
370 F. 3d 602, 608 (CA6 2004).

C

We relay the facts as alleged in the complaint.  Glacier
Northwest sells ready-mix concrete to customers in Wash-
ington State.  Each batch must be mixed to the customer's
specifications.  After Glacier combines the raw ingredi-
ents—cement, sand, aggregate, admixture, and water—in a
hopper, it transfers the resulting concrete to one of its trucks
for prompt delivery.

In this business, time is of the essence.  Concrete is
highly perishable—it begins to harden immediately once at
rest.  Ready-mix trucks can preserve concrete in a rotating

---

[1] We have recognized exceptions to this rule.  One allows a court to
resolve a claim if the party raising it lacks a "reasonable opportunity" to
secure a Board decision on the legal status of the conduct at issue.  *Sears,
Roebuck & Co.* v. *Carpenters*, 436 U. S. 180, 201 (1978); see also *Davis*, 476
U. S., at 393, n. 10.  Another applies if the conduct in question is "a merely
peripheral concern" of the NLRA.  *San Diego Building Trades Council*
v. *Garmon*, 359 U. S. 236, 243 (1959).  A third covers situations "where
the regulated conduct touche[s] interests so deeply rooted in local feeling
and responsibility that, in the absence of compelling congressional direc-
tion," a court cannot conclude that Congress "deprived the States of the
power to act."  *Id.*, at 244.  Because we conclude that the NLRA does
not arguably protect the Union's conduct, we need not address these
exceptions.

drum located on the back of the truck, but only for a limited time. If concrete remains in the rotating drum for too long, it will harden and cause significant damage to the truck. Worse still, the hardening begins right away if the drum stops revolving.

The International Brotherhood of Teamsters Local Union No. 174 (Union) serves as the exclusive bargaining representative for Glacier's truck drivers. After the collective-bargaining agreement between Glacier and the Union expired in the summer of 2017, the parties negotiated in an attempt to reach a new deal. Things did not go smoothly.

Tensions came to a head on the morning of August 11. According to the allegations in Glacier's complaint, a Union agent signaled for a work stoppage when the Union knew that Glacier was in the midst of mixing substantial amounts of concrete, loading batches into ready-mix trucks, and making deliveries. Although Glacier quickly instructed drivers to finish deliveries in progress, the Union directed them to ignore Glacier's orders. At least 16 drivers who had already set out for deliveries returned with fully loaded trucks. Seven parked their trucks, notified a Glacier representative, and either asked for instructions or took actions to protect their trucks. But at least nine drivers abandoned their trucks without a word to anyone.

Glacier faced an emergency. The company could not leave the mixed concrete in the trucks because the concrete's inevitable hardening would cause significant damage to the vehicles. At the same time, the company could not dump the concrete out of the trucks at random because concrete contains environmentally sensitive chemicals. To top it all off, Glacier had limited time to solve this conundrum.

A mad scramble ensued. Glacier needed to determine which trucks had concrete in them, how close the concrete in each truck was to hardening, and where to dump that concrete in an environmentally safe manner. Over the course of five hours, nonstriking employees built special bunkers

and managed to offload the concrete. When all was said and done, Glacier's emergency maneuvers prevented damage to its trucks. But the concrete that it had already mixed that day hardened in the bunkers and became useless.

Glacier sued the Union for damages in Washington state court. Relying on the allegations detailed above, Glacier claimed that the Union intentionally destroyed the company's concrete and that this conduct amounted to common-law conversion and trespass to chattels.

The Union moved to dismiss Glacier's tort claims on the ground that the NLRA preempted them. In the Union's view, the NLRA at least arguably protected the drivers' conduct, so the State was powerless to hold the Union accountable for any of the strike's consequences.

The trial court agreed with the Union. After the appellate court reversed, the Washington Supreme Court reinstated the trial court's decision. In its view, "the NLRA preempts Glacier's tort claims related to the loss of its concrete product because that loss was incidental to a strike arguably protected by federal law." 198 Wash. 2d 768, 774, 500 P. 3d 119, 123 (2021).

We granted certiorari to resolve whether the NLRA preempts Glacier's tort claims alleging that the Union intentionally destroyed its property during a labor dispute. 598 U. S. —— (2022).

## II

As the party asserting preemption, the Union bears the burden of (1) advancing "an interpretation of the [NLRA] that is not plainly contrary to its language and that has not been 'authoritatively rejected' by the courts or the Board," and then (2) putting forth "enough evidence to enable the court to find that" the NLRA arguably protects the drivers' conduct. *Davis*, 476 U. S., at 395. The Union passes the first test but fails the second.

All agree that the NLRA protects the right to strike but that this right is not absolute. Brief for Petitioner 18; Brief

Opinion of the Court

for Respondent 21, 46, n. 14. The Board has long taken the position—which both the Union and Glacier accept—that the NLRA does not shield strikers who fail to take "reasonable precautions" to protect their employer's property from foreseeable, aggravated, and imminent danger due to the sudden cessation of work. *Bethany Medical Center*, 328 N. L. R. B. 1094 (1999) ("concerted activity" is "indefensible where employees fail to take reasonable precautions to protect the employer's plant, equipment, or products from foreseeable imminent danger due to sudden cessation of work"); see also Brief for Petitioner 14, 30–31; Brief for Respondent 28–29; Reply Brief 6–7; Tr. of Oral Arg. 68, 86. Given this undisputed limitation on the right to strike, we proceed to consider whether the Union has demonstrated that the statute arguably protects the drivers' conduct. *Davis*, 476 U. S., at 395. We conclude that it has not.[2]

The drivers engaged in a sudden cessation of work that put Glacier's property in foreseeable and imminent danger. The Union knew that concrete is highly perishable and that it can last for only a limited time in a delivery truck's rotating drum. It also knew that concrete left to harden in a truck's drum causes significant damage to the truck. The Union nevertheless coordinated with truck drivers to initiate the strike when Glacier was in the midst of batching large quantities of concrete and delivering it to customers. Predictably, the company's concrete was destroyed as a result. And though Glacier's swift action saved its trucks in the end, the risk of harm to its equipment was both foreseeable and

---

[2] The Union moved to dismiss Glacier's claims for failure to state a claim and for lack of subject-matter jurisdiction. Like the Washington Supreme Court, we treat both motions together and accept the allegations in the complaint as true at the motion-to-dismiss stage. 198 Wash. 2d 768, 782–783, 500 P. 3d 119, 127 (2021); see also *Kinney* v. *Cook*, 159 Wash. 2d 837, 842, 154 P. 3d 206, 209 (2007). Pursuant to Washington law, we also may consider additional factual allegations made by Glacier that support its complaint. See *Bravo* v. *Dolsen Companies*, 125 Wash. 2d 745, 750, 888 P. 2d 147, 150 (1995).

serious. See *NLRB* v. *Special Touch Home Care Services, Inc.*, 708 F. 3d 447, 460 (CA2 2013) ("The appropriate inquiry is focused on the *risk* of harm, not its realization").

The Union failed to "take reasonable precautions to protect" against this foreseeable and imminent danger. *Bethany Medical Center*, 328 N. L. R. B., at 1094. It could have initiated the strike before Glacier's trucks were full of wet concrete—say, by instructing drivers to refuse to load their trucks in the first place. Once the strike was underway, nine of the Union's drivers abandoned their fully loaded trucks without telling anyone—which left the trucks on a path to destruction unless Glacier saw them in time to unload the concrete. Yet the Union did not take the simple step of alerting Glacier that these trucks had been returned. Nor, after the trucks were in the yard, did the Union direct its drivers to follow Glacier's instructions to facilitate a safe transfer of equipment. To be clear, the "reasonable precautions" test does not mandate any one action in particular. But the Union's failure to take even minimal precautions illustrates its failure to fulfill its duty.

Indeed, far from taking reasonable precautions to mitigate foreseeable danger to Glacier's property, the Union executed the strike in a manner designed to compromise the safety of Glacier's trucks and destroy its concrete. Such conduct is not "arguably protected" by the NLRA; on the contrary, it goes well beyond the NLRA's protections. See *NLRB* v. *Marshall Car Wheel & Foundry Co.*, 218 F. 2d 409, 411, 413 (CA5 1955) (strike unprotected when employees abandoned their posts without warning "when molten iron in the plant cupola was ready to be poured off," even though "a lack of sufficient help to carry out the critical pouring operation might well have resulted in substantial property damage").

Thus, accepting the complaint's allegations as true, the Union did not take reasonable precautions to protect Glacier's property from imminent danger resulting from the drivers' sudden cessation of work. The state court thus

erred in dismissing Glacier's tort claims as preempted on the pleadings.

## III

The Union resists this conclusion. First, it emphasizes that the NLRA's protection of the right to strike should "'be given a generous interpretation.'" Brief for Respondent 21 (quoting *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 234–235 (1963)). A strike, it points out, consists of a "concerted stoppage of work." § 142(2). So, the argument goes, by engaging in a concerted stoppage of work to support their economic demands, the drivers engaged in conduct arguably protected by § 7 of the NLRA.

This argument oversimplifies the NLRA. As we explained, the right to strike is limited by the requirement that workers "take reasonable precautions to protect the employer's plant, equipment, or products from foreseeable imminent danger due to sudden cessation of work." *Bethany Medical Center*, 328 N. L. R. B., at 1094. So the mere fact that the drivers engaged in a concerted stoppage of work to support their economic demands does not end the analysis. We must also ask whether the strike exceeded the limits of the statute.

Second, the Union argues that "workers do not forfeit the Act's protections simply by commencing a work stoppage at a time when the loss of perishable products is foreseeable." Brief for Respondent 22. It points out that the Board has found strikers' conduct protected even when their decision not to work created a risk that perishable goods would spoil. See, *e. g.*, *Lumbee Farms Coop., Inc.*, 285 N. L. R. B. 497 (1987) (raw poultry processing workers), enf'd, 850 F. 2d 689 (CA4 1988); *Central Okla. Milk Producers Assn.*, 125 N. L. R. B. 419 (1959) (milk-truck drivers), enf'd, 285 F. 2d 495 (CA10 1960); *Leprino Cheese Co.*, 170 N. L. R. B. 601 (1968) (cheese factory employees), enf'd, 424 F. 2d 184 (CA10 1970). If the mere risk of spoilage is enough to render a strike illegal, the Union insists, then workers who deal with perishable goods will have no meaningful right to strike.

The Union is swinging at a straw man. It casts this case as one involving nothing more than a foreseeable risk that the employer's perishable products would spoil. But given the lifespan of wet concrete, Glacier could not batch it until a truck was ready to take it. So by reporting for duty and pretending as if they would deliver the concrete, the drivers *prompted the creation* of the perishable product. Then, they waited to walk off the job until the concrete was mixed and poured in the trucks. In so doing, they not only destroyed the concrete but also put Glacier's trucks in harm's way. This case therefore involves much more than "a work stoppage at a time when the loss of perishable products is foreseeable." Brief for Respondent 22.

Third, the Union maintains that the timing of the strike and Glacier's lack of notice cannot render the drivers' conduct unprotected. *Id.*, at 26–28. It argues that workers are not required to time their strikes to minimize economic harm to their employer, see *Lumbee Farms*, 285 N. L. R. B., at 506, and that the NLRA does not impose a legal requirement that workers give specific notice of a strike's timing, see *Columbia Portland Cement Co.* v. *NLRB*, 915 F. 2d 253, 257 (CA6 1990).

We agree that the Union's decision to initiate the strike during the workday and failure to give Glacier specific notice do not themselves render its conduct unprotected. Still, they are relevant considerations in evaluating whether strikers took reasonable precautions, whether harm to property was imminent, and whether that danger was foreseeable. See *International Protective Services, Inc.*, 339 N. L. R. B. 701, 702–703 (2003) (attempt " 'to capitalize on the element of surprise' " stemming from a lack of notice weighed in favor of concluding that a union failed to take reasonable precautions). In this instance, the Union's choice to call a strike *after* its drivers had loaded a large amount of wet concrete into Glacier's delivery trucks strongly suggests that it failed to take reasonable precautions to avoid foreseeable, aggravated, and imminent harm to Glacier's property.

Finally, the Union points out that the drivers returned the trucks to Glacier's facility. And it maintains that all of the drivers left the drums of their trucks rotating, which delayed the concrete's hardening process. In the Union's view, this establishes that the drivers took reasonable precautions to protect the trucks. Brief for Respondent 28–30.

We see it differently. That the drivers returned the trucks to Glacier's facility does not do much for the Union— refraining from stealing an employer's vehicles does not demonstrate that one took reasonable precautions to protect them. And Glacier's allegations do not support the Union's assertion that all of the drivers left the drums rotating. The Union relies on a vague remark by an unspecified Union agent to another unspecified person to leave a truck running. See *id.*, at 9, 30; Brief for Petitioner 8; App. 34. This snippet does not show that all of the drivers left their trucks running, and even if it did, that would not necessarily mean that the delivery trucks' drums continued rotating. In any event, Glacier alleged that if concrete remains in a ready-mix truck for too long, it will harden and cause significant damage to the truck. The rotating drum forestalls that hardening for a time, but not indefinitely. And the Union concedes that the NLRA does not arguably protect its actions if they posed a material risk of harm to the trucks. Tr. of Oral Arg. 78.[3]

\*    \*    \*

Glacier alleges that the drivers' conduct created an emergency in which it had to devise a way to offload concrete "in a

---

[3] After the Washington Supreme Court affirmed the dismissal of Glacier's tort claims, the Board's general counsel issued a complaint alleging that Glacier engaged in unfair labor practices in relation to its labor dispute with the drivers, including by disciplining some of those involved in the strike. The lower courts have not addressed the significance, if any, of the Board's complaint with respect to *Garmon* preemption. We will not do so in the first instance. *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005) ("[W]e are a court of review, not of first view"). The Board's general counsel agrees that this issue is not properly before us. See Brief for United States as *Amicus Curiae* 28.

Thomas, J., concurring in judgment

timely manner to avoid costly damage to [its] mixer trucks."
App. 72. The Union's actions not only resulted in the de-
struction of all the concrete Glacier had prepared that day;
they also posed a risk of foreseeable, aggravated, and immi-
nent harm to Glacier's trucks. Because the Union took af-
firmative steps to endanger Glacier's property rather than
reasonable precautions to mitigate that risk, the NLRA does
not arguably protect its conduct. We reverse the judgment
of the Washington Supreme Court and remand the case for
further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins,
concurring in the judgment.

I agree that petitioner's state-court claims are not pre-
empted by the National Labor Relations Act (NLRA). The
majority reaches this conclusion, however, by applying the
Court's precedent in *San Diego Building Trades Council* v.
*Garmon*, 359 U. S. 236 (1959), which held that state courts
are disabled from adjudicating state-law claims that concern
conduct "arguably" protected under the NLRA. *Id.*, at
245–246. Because this Court has previously held that the
type of conduct alleged here is not protected, I join JUS-
TICE ALITO's opinion concurring in the judgment. I write
separately to emphasize the oddity of *Garmon*'s broad pre-
emption regime.

This Court typically applies a high bar before concluding
that federal law "strip[s] state courts of jurisdiction to hear
their own *state* claims." *Atlantic Richfield Co.* v. *Christian*,
590 U. S. ——, —— – ——. Likewise, the Court generally re-
quires a "clear" purpose to displace state law before finding
that a federal statute does so. *Wyeth* v. *Levine*, 555 U. S.
555, 565 (2009) (internal quotation marks omitted).

As the majority notes, however, *Garmon* "goes beyond the
usual preemption rule." *Ante*, at 776. In *Garmon*, the
Court determined that, "[w]hen an activity is arguably sub-
ject to § 7 or § 8 of the Act" (which, respectively, concern

employees' right to engage in concerted activity and unfair labor practices), "the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board [(NLRB or Board)]." 359 U. S., at 245. The Court went on to explain that this prophylactic rule of pre-emption may apply even to state-court claims arising under state private law (rather than the NLRA or a comparable state regulatory scheme) and even to claims seeking remedies not available from the Board. *Id.*, at 246–248.* Nor, under the Court's rule, is the State's power to act restored if the NLRB "fail[s] to determine the status of the disputed conduct by declining to assert jurisdiction, or by refusal . . . to file a charge; or by adopting some other disposition which does not define the nature of the activity with unclouded legal significance." *Id.*, at 245–246.

*Garmon* acknowledged that the NLRA's pre-emption implications " 'are of a Delphic nature,' " leaving the States' residual power in a " 'penumbral area [that] can be rendered progressively clear only by the course of litigation.' " *Id.*, at 240–241 (quoting *Machinists* v. *Gonzales*, 356 U. S. 617, 619 (1958); *Weber* v. *Anheuser-Busch, Inc.*, 348 U. S. 468, 480–481 (1955)). It thus emphasized that "Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency," making it "essential to the administration of the Act" that determinations about protected and prohibited conduct "be left in the first instance to the [NLRB]." 359 U. S., at 242, 244–245. To do otherwise, it feared, "would create potential frustration of national pur-

---

*Nonetheless, and motivated by "due regard for the presuppositions of our embracing federal system," *Garmon* carved out two areas of presumptive state control: (1) "where the activity regulated was a merely peripheral concern of the [NLRA as amended]," and (2) where it "touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, [the Court] could not infer that Congress had deprived the States of the power to act." 359 U. S., at 243–244.

Thomas, J., concurring in judgment

poses" and invite "the danger of state interference with national policy." *Id.*, at 244–245.

Justice Harlan concurred in the result, warning that the majority's rule would "reduc[e] to the vanishing point" States' "power to redress wrongful acts in the labor field" and provide any "effective remedy under their own laws for . . . tortious conduct." *Id.*, at 253–254. The years since have borne out that warning. *Garmon* elevates "even the remotest possibility of conflict," thereby "overstat[ing] the likelihood and significance of conflicts and . . . set[ting] up an unreal goal of doctrinal and factual harmony." L. Jaffe, Primary Jurisdiction, 77 Harv. L. Rev. 1037, 1053 (1964). In effect, "*Garmon* doctrine completely pre-empts state-court jurisdiction unless the Board determines that the disputed conduct is neither protected nor prohibited by the [NLRA]." *Sears, Roebuck & Co.* v. *Carpenters*, 436 U. S. 180, 199, n. 29 (1978).

The majority opinion today underscores the strangeness of the *Garmon* regime. Here, the Supreme Court of the United States reassures a state court of its power to adjudicate a state-law tort claim. The Court does so, not based on its own judgment that federal law does not pre-empt the claim, but because the NLRB's existing precedents adequately remove any "[c]lou[d]" over the matter. 359 U. S., at 246. But, if the Board's precedents left the matter "arguable" (and the NLRA did not plainly dictate an answer), then the state courts would be "ousted" of jurisdiction. *Longshoremen* v. *Davis*, 476 U. S. 380, 396 (1986). The upshot of this approach appears to be that the scope of the NLRA's pre-emption of state-court jurisdiction over state claims is defined—not by the statutory text—but by "penumbra[s]" that wax and wane as the Board develops, or declines to develop, its own carefully insulated common law of labor relations. *Garmon*, 359 U. S., at 240 (internal quotation marks omitted).

The parties here have not asked us to reconsider *Garmon*, nor is it necessary to do so to resolve this case. Nonetheless, in an appropriate case, we should carefully reexamine whether the law supports *Garmon*'s "unusual" pre-emption regime. *Ante*, at 776. In doing so, I would bear in mind that any proper pre-emption inquiry must focus on the NLRA's text and ask whether federal law and state law "are in logical contradiction," such that it is impossible to comply with both. *Merck Sharp & Dohme Corp.* v. *Albrecht*, 587 U. S. ——, —— (2019) (THOMAS, J., concurring); see also *PLIVA, Inc.* v. *Mensing*, 564 U. S. 604, 617–618 (2011).

JUSTICE ALITO, with whom JUSTICE THOMAS and JUSTICE GORSUCH join, concurring in the judgment.

I agree with the Court that the Washington Supreme Court erred in holding that Glacier Northwest's complaint is preempted under *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236 (1959). The National Labor Relations Act (NLRA) protects the right to strike, but that right is subject to certain limitations and qualifications, see 29 U. S. C. § 163, and this Court's decisions make clear that the Act does not protect striking employees who engage in the type of conduct alleged here.

This Court has long recognized that the Act does not "invest those who go on strike with an immunity from discharge for acts of trespass or violence against the employer's property." *NLRB* v. *Fansteel Metallurgical Corp.*, 306 U. S. 240, 255 (1939). To justify "despoiling [an employer's] property" or "the seizure and conversion of its goods," we have reasoned, "would be to put a premium on resort to force instead of legal remedies." *Id.*, at 253. It follows that *Garmon* preemption does not prevent States from imposing liability on employees who intentionally destroy their employer's property. See, *e. g.*, *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U. S. 132, 136 (1976) ("Policing . . . destruction of property has been held most clearly a matter for the States"); *Construction Workers* v. *Laburnum Constr.*

*Corp.*, 347 U. S. 656, 669 (1954) (The NLRA does not allow employees to "destroy property without liability for the damage done"); *Electrical Workers* v. *Wisconsin Employment Relations Bd.*, 315 U. S. 740, 748 (1942) (The NLRA "was not designed to preclude a State" from regulating threats of property damage); see also *Linn* v. *Plant Guard Workers*, 383 U. S. 53, 61–62 (1966) ("'[T]here is no ground for concluding that existing criminal penalties or liabilities for tortious conduct have been eliminated'" by the NLRA); *Bill Johnson's Restaurants, Inc.* v. *NLRB*, 461 U. S. 731, 741–742 (1983) ("It has . . . repeatedly been held that an employer has the right to seek local judicial protection from tortious conduct during a labor dispute").

Nothing more is needed to resolve this case. Glacier's complaint alleges that the Union and its members acted "with the improper purpose to harm Glacier by causing [its] batched concrete to be destroyed." App. 10; accord, *id.*, at 14, 19–20. As the Court recognizes, they succeeded by "prompt[ing] the creation of the perishable product" and then ceasing work when the concrete was in a vulnerable state. *Ante*, at 783 (emphasis deleted); see App. 10–13. Because this Court has long rejected the Union's claim that this kind of conduct is protected, *Garmon* preemption does not apply. See *Longshoremen* v. *Davis*, 476 U. S. 380, 395 (1986).*

JUSTICE JACKSON, dissenting.

The right to strike is fundamental to American labor law. Congress enshrined that right in the National Labor Relations Act (NLRA) and simultaneously established the Na-

---

*The Court wisely declines to address the argument on which JUSTICE JACKSON relies regarding the effect of the complaint before the NLRB on this litigation. See *post*, at 796–799 (dissenting opinion). That argument represents a striking extension of *Garmon* preemption, which, as the Court notes, is already an "unusual" doctrine. See *ante*, at 776. If the state courts on remand dismiss this case on that ground, the decision, in my judgment, would be a good candidate for a quick return trip here.

tional Labor Relations Board to adjudicate disputes that
arise between workers and management. That decision re-
flected Congress's judgment that an agency with specialized
expertise should develop and enforce national labor law in a
uniform manner, through case-by-case adjudication. For its
part, this Court has scrupulously guarded the Board's au-
thority for more than half a century. See *San Diego Build-
ing Trades Council* v. *Garmon*, 359 U. S. 236 (1959). Under
*Garmon*, and as relevant here, a court presented with a tort
suit based on strike conduct generally must pause proceed-
ings and permit the Board to determine in the first instance
whether the union's conduct is lawful if the conduct at issue
is even "arguably" protected by the NLRA. *Id.*, at 245.

Today, the Court falters. As the majority acknowledges,
the Board's General Counsel has filed a complaint with the
Board after a thorough factual investigation, and that com-
plaint alleges that the NLRA protects the strike conduct at
the center of this state-court tort suit. The logical implica-
tion of a General Counsel complaint under *Garmon* is that
the union's conduct is at least *arguably* protected by the
NLRA. Consequently, where (as here) there is a General
Counsel complaint pending before the Board, courts—includ-
ing this Court—should suspend their examination. *Garmon*
makes clear that we have no business delving into this par-
ticular labor dispute at this time.

But instead of modestly standing down, the majority ea-
gerly inserts itself into this conflict, proceeding to opine on
the propriety of the union's strike activity based on the facts
alleged in the employer's state-court complaint. As part of
this mistaken expedition, the majority tries its own hand at
applying the Board's decisions to a relatively novel scenario
that poses difficult line-drawing questions—fact-sensitive is-
sues that Congress plainly intended for the Board to address
after an investigation. And in the course of inappropriately
weighing in on the merits of those questions at this stage,
the majority also misapplies the Board's cases in a manner

that threatens to both impede the Board's uniform development of labor law and erode the right to strike.

In my view, today's misguided foray underscores the wisdom of Congress's decision to create an agency that is uniquely positioned to evaluate the facts and apply the law in cases such as this one. This case is Exhibit A as to why the Board—and not the courts—should ordinarily take the first crack at resolving contentious, fact-bound labor disputes of this nature. Because the majority's ruling suggests otherwise, I respectfully dissent.

I

The majority's brief opinion quotes *Garmon*'s "arguably protected" test and endeavors to apply it. *Ante*, at 776–777, 779–784. But the opinion devotes relatively little space to the origins and purpose of that longstanding precedent. That omission is telling. A proper understanding of *Garmon*'s foundation sheds considerable light on the majority's sequential missteps in this case.

A

Congress's passage of the NLRA "marked a fundamental change in the Nation's labor policies." *Sears, Roebuck & Co.* v. *Carpenters*, 436 U. S. 180, 190 (1978). Prior to that point, union activity had been viewed as "a species of 'conspiracy,'" prompting substantial conflict between labor and management. *Ibid.* With the enactment of the NLRA in 1935, "Congress expressly recognized that collective organization of segments of the labor force into bargaining units capable of exercising economic power comparable to that possessed by employers may produce benefits for the entire economy in the form of higher wages, job security, and improved working conditions." *Ibid.*

The heart of the NLRA is §7, which safeguards workers' rights "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activ-

ities for the purpose of collective bargaining or other mutual aid or protection." 29 U. S. C. § 157. Among the "'concerted activities'" that the Act unquestionably protects is "the vital, economic instrumen[t] of the strike." *Garmon*, 359 U. S., at 241; see § 163.

Section 8 of the NLRA provides a list of "unfair labor practice[s]" that employers and unions are prohibited from engaging in. § 158. For example, it is an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of" their § 7 rights, including the right to strike. § 158(a)(1). And it is an unfair labor practice for a union to "refuse to bargain collectively with an employer." § 158(b)(3). Taken together, § 7 and § 8 establish certain conduct that Congress has deemed protected (§ 7) and prohibited (§ 8).

B

Congress could have stopped there. But "Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties." *Garner* v. *Teamsters*, 346 U. S. 485, 490 (1953). Rather, Congress "went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal": the National Labor Relations Board. *Ibid.*; see generally §§ 153–156.

By statutory mandate, the Board is composed of five members who are appointed by the President with the advice and consent of the Senate. § 153(a). Congress also provided for an independent General Counsel, who is likewise presidentially appointed and Senate confirmed. § 153(d); see *NLRB* v. *Food & Commercial Workers*, 484 U. S. 112, 117–118 (1987). The General Counsel conducts investigations into unfair labor practices and brings complaints before the Board through a "particular procedure" that Congress has prescribed "for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order" from the Board. *Garner*, 346 U. S., at 490; see §§ 153, 160.

The Board has fleshed out this process via rulemaking authority that Congress has delegated. § 156. If a person believes that an employer or union has committed an unfair labor practice, the person may file a charge with a regional director, who acts on behalf of the General Counsel. 29 CFR § 101.2 (2022). The regional director investigates the charge. § 101.4. If "the charge appears to have merit and efforts to dispose of it by informal adjustment are unsuccessful," the regional director issues a complaint on behalf of the General Counsel. § 101.8. When a General Counsel's complaint issues, an administrative law judge (ALJ) holds a hearing and issues a decision, which the Board reviews if any party files an exception. §§ 101.8–101.12. If the Board finds that a party has engaged in an unfair labor practice, it must order the party to "cease and desist" and to take "such affirmative action . . . as will effectuate the policies" of the NLRA. 29 U. S. C. § 160(c).

C

The history and structure of the NLRA make clear that Congress "entrusted administration of the labor policy for the Nation to a centralized administrative agency"—the Board—"armed with its own procedures, and equipped with its specialized knowledge and cumulative experience." *Garmon*, 359 U. S., at 242. Congress thought the Board's primary role was "necessary to obtain uniform application of [the NLRA's] substantive rules and to avoid th[e] diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies." *Garner*, 346 U. S., at 490. That judgment makes perfect sense. The NLRA's substantive principles are intrinsically broad and potentially conflicting, leaving much for future articulation through case-by-case adjudication. Drawing the line between activities that constitute a protected strike, on the one hand, and unprotected actions for which employers may validly discipline employees, on the other, is a legally and factually complex task. Moreover, that task implicates im-

portant economic policy considerations about the relative bargaining power of labor and management that affect not only the parties to a particular labor dispute but also our broader national economy.

To effect Congress's intent, this Court has consistently recognized that "courts are not primary tribunals to adjudicate [these] issues." *Garmon*, 359 U. S., at 244. Rather, "it is to the Board that Congress entrusted the task of applying the Act's general . . . language in the light of the infinite combinations of events which might be charged as violative of its terms." *Beth Israel Hospital* v. *NLRB*, 437 U. S. 483, 500–501 (1978) (internal quotation marks omitted). And the Board, "if it is to accomplish the task which Congress set for it, necessarily must have authority . . . to fill the interstices of the broad statutory provisions." *Id.*, at 501. So, while the Board's decision "is not the *last* word" on these complex matters—given that its decisions are subject to review in federal court—"it must assuredly be the *first*." *Marine Engineers* v. *Interlake S. S. Co.*, 370 U. S. 173, 185 (1962) (emphasis added).

For that reason, this Court has long held that courts presented with claims arising out of a labor dispute must sometimes pause their proceedings to permit the Board to consider the dispute in the first instance. As relevant here, we have held that if §7—including its protection of the right to strike—"arguably" protects the conduct at issue in a state-court suit, then the court must await the Board's word as to whether the conduct is, in fact, protected. *Garmon*, 359 U. S., at 245.

To determine whether conduct is "arguably protected," a state court examines the showing of the party invoking *Garmon* and seeking to pause the litigation. The court asks whether that party has (1) "advance[d] an interpretation of the [NLRA] that is not plainly contrary to its language and that has not been 'authoritatively rejected' by the courts or the Board," and (2) "put forth enough evidence to enable the

court to find that the Board reasonably could uphold a claim based on such an interpretation." *Longshoremen* v. *Davis*, 476 U. S. 380, 395 (1986). If so, the state court must pause proceedings to allow the Board to consider the complex legal and factual contours of the question whether the union's conduct is *actually* protected by the NLRA.

The majority refers to this as "*Garmon* preemption," in keeping with historical practice. *Ante*, at 776. But the term "preemption" is something of a misnomer. Rather than entirely and automatically precluding the state-court suit, the rule instead requires state courts to take a "jurisdictional hiatus" while the Board considers the dispute in the first instance. *Sears, Roebuck & Co.*, 436 U. S., at 203. If the Board determines (subject to judicial review) that § 7 protects the union's conduct, normal conflict preemption kicks in: A state court may not hold a union liable on state-law claims for conduct that is protected by the NLRA. See *Brown* v. *Hotel Employees*, 468 U. S. 491, 503 (1984). But "if the Board decides that the conduct is not protected," the state court may proceed to "entertain the litigation." *Davis*, 476 U. S., at 397.[1]

With these general principles in mind, I now turn to the particulars of this case.

## II

This suit arises out of a union-organized strike. Petitioner Glacier Northwest is a concrete-delivery company, and

---

[1] JUSTICE THOMAS seeks to undercut our *Garmon* precedent by describing it as "od[d]" and "strang[e]" relative to "'the usual preemption rule.'" *Ante*, at 785, 787 (opinion concurring in judgment). But, as discussed, the *Garmon* rule is not a standard preemption doctrine; it is different because it is doing different work. *Garmon* protects Congress's judgment that the Board, not state or federal courts, should be generally responsible for the development of our Nation's labor law. The required pause when *Garmon*'s "arguably protected" test is satisfied allows for efficient resolution of the dispute prior to the expenditure of state judicial resources, and the temporary nature of the pause makes it narrower, not broader, in effect than ordinary preemption.

respondent International Brotherhood of Teamsters Local Union No. 174 (Union) represents Glacier's concrete-delivery truckdrivers. After the drivers went on strike, Glacier sent disciplinary letters to some of the drivers. The Union filed an unfair labor practice charge with the Board, alleging that the disciplinary letters were unlawful retaliation against the drivers for engaging in strike conduct that is protected by the NLRA.

Glacier then filed a complaint in Washington state court, alleging that the Union engaged in tortious conduct when it instructed the drivers to strike at a time when there was wet concrete in some of the company's delivery trucks. In response, the Union filed another Board charge, maintaining that Glacier's lawsuit constituted additional unlawful retaliation.

With respect to Glacier's tort suit, the Washington courts engaged in the standard *Garmon* inquiry, ultimately resulting in a determination by the Washington Supreme Court that the lawsuit could not proceed because the Union's strike conduct was arguably protected by the NLRA. Glacier sought, and we granted, certiorari to review that decision. Notably, however, after the Washington Supreme Court issued its decision, the regional director acting on behalf of the Board's General Counsel filed an administrative complaint against Glacier. In my view, for the reasons explained below, that subsequent event has greatly simplified the *Garmon* question.

## A

The filing of the General Counsel's administrative complaint necessarily suffices to establish that the Union's strike conduct is "arguably protected" within the meaning of *Garmon*. Thus, the General Counsel's complaint should have marked the end of any court involvement in this matter at this time.

The General Counsel's complaint alleges that Glacier interfered with strike conduct protected by § 7 when it disciplined

its drivers for walking off the job and when it filed this tort suit. That complaint represents the General Counsel's conclusion—reached after an extensive independent investigation involving collecting testimony and other evidence, and after careful consideration of the competing legal principles and policy concerns—that the Union's claim that its strike conduct was protected "appears to have merit." 29 CFR §§ 101.4, 101.8. One "cannot credibly contend that a claim that makes it through this gauntlet does not concern conduct 'arguably' protected by the NLRA." *Davis Supermarkets, Inc.* v. *NLRB*, 2 F. 3d 1162, 1179 (CADC 1993); accord, *Makro, Inc.*, 305 N. L. R. B. 663, 670 (1991).

A court presented with a General Counsel complaint should therefore find *Garmon* inherently satisfied. This is so because the entire point of *Garmon*'s arguably-protected test is to permit the court to assess the facts and relevant labor law in service of a *gatekeeping* function. The answer to the *Garmon* question simply (and solely) establishes whether the court can continue to entertain a lawsuit that relates to the challenged strike conduct, or whether the legal action must be suspended to allow the Board to make an initial assessment of the matter. The court evaluates the existing evidence and the law for a specific reason: to determine whether the lawsuit attacks arguably-protected conduct such that entertaining the legal action will interfere with the Board's prerogative to develop the facts and adjudicate the merits of the dispute as part of the Board's broader authority to develop national labor law.

If the General Counsel investigates the matter and files a complaint with the Board alleging that the union's conduct is protected, it becomes indisputable that the pending legal action might interfere with the Board's authority. Thus, a General Counsel complaint relieves the court of the burden of having to make the arguably-protected assessment based on its *own* understanding of the evidence and labor law—it is "arguable" that the union's conduct is protected because

the General Counsel is arguing just that. To be sure, we have said that the arguably-protected test is "not without substance" and is "not satisfied by a conclusory assertion of pre-emption." *Davis*, 476 U. S., at 394. But an allegation from the Board's General Counsel after a thorough investigation is a far cry from a "conclusory assertion" of protection.[2]

What is more, by virtue of the General Counsel's complaint, the Board is, at this very moment, exercising its authority to adjudicate the merits of this dispute. On January 11, 2023, an ALJ denied Glacier's motion to postpone the ALJ hearing on the General Counsel's complaint pending this Court's decision in this case. As the ALJ explained, the General Counsel's pleading "constituted a determination that the strikers' conduct was at least arguably protected by the [NLRA] and that this agency became the exclusive forum for adjudicating whether the strikers' conduct was protected."[3] A nine-day hearing ensued, and the parties completed post-hearing briefing last week. We have said that "[t]he need for protecting the exclusivity of [the Board's] jurisdiction is obviously greatest when the precise issue brought before a court is in the process of litigation through procedures originating in the Board." *Marine Engineers*, 370 U. S., at 185. That is exactly the situation here.

For these reasons, I believe that the filing of the General Counsel's complaint is more than sufficient to trigger *Garmon*'s pause, and that it must be so if consistency with Congress's intent to give the Board primary authority to interpret and enforce the NLRA is to be maintained. In circumstances like these, "the States as well as the federal courts must defer to the exclusive competence of the Na-

---

[2] This is not to suggest that the General Counsel's complaint is the end of the story, as the Board may ultimately disagree with the factual or legal basis of that pleading. But the complaint is surely sufficient to establish *arguable* protection, such that a court should stay its hand.

[3] Order Denying Motion for Postponement of Hearing in *Glacier Northwest, Inc.*, Nos. 19–CA–203068, 19–CA–211776, p. 7.

tional Labor Relations Board." *Garmon*, 359 U. S., at 245. And this Court is no exception. Because the General Counsel has now filed a complaint with the Board concerning the labor dispute at issue in this case, all courts—including this one—should stand down.

B

The majority does not take issue with my conclusion that the General Counsel's complaint triggers a *Garmon* hiatus; instead, it takes no position on the matter, leaving the question open for the Washington courts to decide on remand. *Ante*, at 784, n. 3.

The majority's reason for declining to address this argument is noteworthy. It explains that, because the General Counsel's complaint was filed after the Washington Supreme Court had affirmed the dismissal of Glacier's complaint on *Garmon* grounds, "[t]he lower courts have not addressed the significance, if any, of the Board's complaint with respect to *Garmon* preemption." *Ante*, at 784, n. 3. And since we are "'a court of review, not of first view,'" *ibid.* (quoting *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005)), the majority declines to "do so in the first instance." *Ante*, at 784, n. 3.

This rationale is inconsistent with the broader approach that the majority takes in this case. It would be one thing if the Court simply noted the filing of the General Counsel's complaint and authorized the lower courts to evaluate the impact of that complaint on the *Garmon* question in the first instance. But it goes further: The majority also inserts itself into the midst of this labor dispute *now* (despite the General Counsel's complaint), proceeding to apply the Board's cases to novel and difficult line-drawing questions and ultimately concluding that the strike conduct alleged in Glacier's complaint is not even arguably protected.

The majority cannot have it both ways. A concern about the Court's institutional role justifies, at most, vacating the judgment below and remanding for the lower court to consider the import of the General Counsel's complaint. The

same observation that compels the majority to allow for such lower-court consideration—that we are "'a court of review, not of first view,'" *ante*, at 784, n. 3—should have likewise led it to decline to intrude into this labor dispute while it is pending before the Board.

## III

For the reasons discussed above, I would have vacated the Washington Supreme Court's judgment and remanded with directions to stay proceedings or dismiss Glacier's complaint without prejudice, on the straightforward ground that the General Counsel's complaint triggers the jurisdictional hiatus that *Garmon* requires.[4]

The majority sidesteps my preferred resolution of this matter and instead proceeds to engage in *Garmon*'s "arguably protected" test by applying a series of fact-intensive Board decisions to the bare allegations in Glacier's state-court complaint. To do this, the majority invokes the Board's "reasonable precautions" principle. *Ante,* at 779–782. That principle (discussed in Part IV, *infra*) is derived from the Board's determination that striking workers must take reasonable precautions to protect persons, the employer's premises, and its equipment from foreseeable, aggravated, and imminent harm due to the sudden cessation of work. The majority has taken it upon itself to apply the Board's reasonable-precautions principle to the factual allegations about the Union's conduct that Glacier alleges in this lawsuit, and it thereby concludes that the drivers' conduct is not even arguably protected by the NLRA.

This course of action (which is already confounding given that the Board itself is currently considering the challenged strike conduct with the benefit of developed facts and labor

---

[4] The Washington Supreme Court affirmed the dismissal of Glacier's claims. Because only a pause of the state-court litigation is necessary under *Garmon*, the proper disposition is either a stay of proceedings or dismissal without prejudice.

law expertise) reflects an analytical approach to the issues presented that cannot be squared with *Garmon*.

### A

Whether the NLRA protects particular strike conduct often turns on subtle factual disputes and nuanced legal distinctions. Here, for example, whether the Union's strike conduct is protected or unprotected might well depend on whether the drivers left the concrete-delivery trucks' revolving drums turning when they walked off the job. So, too, might it depend on fine legal gradations concerning how imminent or how aggravated the risk of harm must be to trigger the duty to take reasonable precautions. These kinds of determinations cry out for evidentiary hearings, and in this highly fact-sensitive area of the law, which generally develops on a case-by-case basis, the scope of NLRA protection in a given set of circumstances is typically determined once the facts have been established—through discovery, debate, and sometimes the tedious work of making contentious credibility determinations.

Fortunately, in this regard, Congress has gifted our legal system with an expert agency that thoroughly investigates what happened—*i. e.*, the facts of strike-related labor disputes—and then engages in the initial task of answering the sometimes complex, always fact-bound question whether the NLRA protects the strike conduct at issue. Meanwhile, a court that is undertaking *Garmon*'s arguably-protected analysis is engaged in a fundamentally different inquiry. As explained in Part II–A, *supra*, while the court is most certainly considering strike conduct arising from a labor dispute, it is not meant to address the merits of these complex questions. Under the NLRA and *Garmon*, courts must take as a given that the Board is the entity to which Congress has assigned responsibility for initially determining what happened and taking the first crack at deciding whether the NLRA protects the union's conduct. And far from usurping that

Board function, *Garmon* tasks the court with merely conducting a threshold, gatekeeping assessment of whether the lawsuit before it must be paused, or whether the suit can proceed because it is not even *arguable* that the conduct at issue in the lawsuit is protected by the NLRA.

To avoid veering into the Board's assigned territory, it is crucial that the courts have a clear understanding of the nature of the *Garmon* assessment and what it requires. The court asks, first of all, whether the party invoking *Garmon* has "advance[d] an interpretation of the [NLRA] that is not plainly contrary to its language and that has not been 'authoritatively rejected' by the courts or the Board." *Davis*, 476 U. S., at 395. This inquiry involves merely comparing the union's claim about the scope of its protection to the broad protective language of the statute and deciding whether the union's interpretation has already been definitively rejected either by courts or by the Board.

The second task is to determine whether the party invoking *Garmon* has "put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation." *Davis*, 476 U. S., at 395. Again, this is not an invitation to supplant the Board's fact-finding role or to usurp the authority that Congress has given the Board to make the initial underlying protected-or-unprotected determination. Rather, the point of this part of the *Garmon* assessment is simply to determine whether *it is arguable* that the Board—in the exercise of its discretion to develop labor law and aided by its investigation into the facts—could conclude that the strike conduct at issue is protected by the NLRA. See 359 U. S., at 245.

Thus, consistent with a statutory scheme that gives primacy to the agency's expertise, a court's task under *Garmon* is unmistakably modest. It must merely assess whether, in light of existing law and the evidence that has been amassed related to this strike, it is *possible* that the union could prevail before the Board. Put another way, instead of stepping

into the Board's shoes as primary factfinder, or even prog-
nosticating about what the Board is likely to decide concern-
ing the extent of NLRA coverage, a court that stands down
upon a proper *Garmon* analysis has simply determined (1)
that existing law does not plainly and authoritatively pro-
hibit the strike conduct at issue, and (2) that evidence exists
concerning how the strike was conducted that might ulti-
mately favor the union, such that the lawsuit should pause
to allow the Board to gather the facts and apply its expertise
to determine whether the strike was lawful.

B

The majority seems to misunderstand all this in the con-
text of this case. It correctly concludes that the Union has
carried its burden of "advancing an interpretation of the
[NLRA] that is not plainly contrary to its language and that
has not been authoritatively rejected by the courts or the
Board." *Ante*, at 779 (internal quotation marks omitted).
But it finds that the Union has failed to satisfy the second
*Garmon* step, and it does so after undertaking its own as-
sessment of the facts alleged in Glacier's complaint and
endeavoring to apply the Board's fact-bound reasonable-
precautions precedents. See, *e. g.*, *ante*, at 780–781 (deter-
mining, based on alleged facts, that "[t]he drivers engaged in
a sudden cessation of work that put Glacier's property in
foreseeable and imminent danger" and that the risk of harm
to the concrete-delivery trucks was "both foreseeable and
serious"); *ante*, at 781 (concluding that "[t]he Union failed to
'take reasonable precautions,'" after hypothesizing various
steps that, according to the majority, the Union should have
taken but did not).

Given what I have already said about *Garmon*'s purpose
and what it calls for, the majority's error in proceeding in
this fashion is obvious. To my mind, if a court that is evalu-
ating what to do per *Garmon* finds itself weighing in on such
fact-bound matters as whether the strike posed a risk of

harm that was aggravated enough or imminent enough to remove NLRA protection, or starts contemplating whether the precautions that the striking employees took to address any such risk were reasonable enough to allow them to retain the right to strike, it has unwittingly wandered into a domain that Congress intentionally assigned to the Board to address in the first instance.[5]

It is clear to me that Congress plainly intended for the Board's factfinding function to be at the forefront of this kind of legal evaluation. Thus, in my view, when a court undertakes the *Garmon* analysis in a context such as this one, it should take care to limit itself to its own assigned responsibility: the mere determination of whether, given the union's evidence and legal interpretation, the Board *could* possibly conclude that the union had taken reasonable precautions. If yes, the court should suspend the pending legal action to let the Board decide the question. To conclude no, given the fact-bound nature of the reasonable-precautions analysis, a court in all but the most exceptional circumstances will need to be able to point to a reasonable-precautions case from the Board that is on all fours with the facts of the case before it and that found the conduct unprotected. In that circumstance, the court can proceed with the suit, without breaking new legal ground on the scope of the right to strike.

In all events, then, courts can properly decide the *Garmon* issue without making law in this area, precisely as Congress intended. Indeed, I think we best respect congressional intent regarding the Board's authority to develop uniform

---

[5] Justice Blackmun warned that a formulation of the *Garmon* test that directs attention to a party's evidence might lead some courts to make such an errant assessment, "under the guise of weighing the sufficiency of the evidence." *Longshoremen* v. *Davis*, 476 U. S. 380, 404 (1986) (opinion concurring in part and dissenting in part) (expressing the concern that a future court might misunderstand its role and mistakenly undertake "[to] mak[e] precisely the determination that *Garmon* makes clear is for the Board, and only the Board, to make"). That warning was prescient.

labor law by leaving the application of the Board's reasonable-precautions principle to the Board itself. The majority's contrary approach opens up the possibility that courts around the country will now act on bare allegations to generate conflicting results about the contours of the venerated right to strike, which, ironically, was the primary concern that motivated Congress to create the Board in the first place.

## IV

For what it's worth, even if the majority's approach to deciding the *Garmon* question were the correct one, the majority misapplies the reasonable-precautions principle to the allegations here in a manner that threatens to impinge on the right to strike and on the orderly development of labor law.

### A

#### 1

A strike, by definition, is a "concerted stoppage of work by employees," or "any concerted slowdown or other concerted interruption of operations by employees." § 142(2). When employees stop working, production may halt, deliveries may be delayed, and services may be canceled. At the risk of stating the obvious, this means that the workers' right to strike inherently includes the right to impose economic harm on their employer.

Congress was well aware that organized labor's exercise of the right to strike risks harm to an employer's economic interests. See § 151; *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 234 (1963) (Congress's protection of the right to strike reflects its understanding that strikes are authorized "economic weapon[s]"). Yet, Congress protected that right anyway. In fact, the threat of economic harm posed by the right to strike is a feature, not a bug, of the NLRA. The potential pain of a work stoppage is a powerful tool, and one that unquestionably advances Congress's codified goal of

achieving "equality of bargaining power between employers and employees." §151. Unions leverage a strike's economic harm (or the threat of it) into bargaining power, and then wield that power to demand improvement of employees' wages and working conditions—goals that, according to Congress, benefit the economy writ large. See *Sears, Roebuck & Co.*, 436 U. S., at 190.

Still, the right to strike is, of course, not unlimited. But when "Congress chose to qualify the use of the strike, it did so by prescribing the limits and conditions of the abridgment in exacting detail." *Erie Resistor*, 373 U. S., at 234. Section 8 enumerates several limitations. For example, a union must notify an employer that it intends to terminate or modify its contract—and thus that a strike is possible—at least 60 days before striking. §158(d). A union cannot strike for unlawful purposes, such as putting economic pressure on parties other than the primary employer. §158(b)(4)(i)(B). And, in certain healthcare settings, unions must provide at least 10 days' notice of the precise date and time of a strike. §158(g).

Additionally, §163 of the NLRA (which Congress added via the 1947 Taft-Hartley Amendments, 61 Stat. 151) states that "[n]othing in this subchapter, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right."

Thus, the text of the NLRA allows for only two kinds of limitations on the right to strike: those enumerated in the Act itself, and the "limitations or qualifications" on the right that existed when the Taft-Hartley Amendments were enacted. See *NLRB* v. *Drivers*, 362 U. S. 274, 281–282 (1960). The only relevant limitation here is the one set out in *NLRB* v. *Fansteel Metallurgical Corp.*, 306 U. S. 240 (1939).[6]

---

[6] The Senate Report accompanying the Taft-Hartley Amendments explained the four kinds of pre-existing "limitations or qualifications" on the right to strike that Congress had in mind in §163, which were drawn from

Page Proof Pending Publication

JACKSON, J., dissenting

Our *Fansteel* decision stands for the principle that "employees ha[ve] the right to strike but they ha[ve] no license to commit acts of violence or to seize their employer's plant." *Id.*, at 253. The facts of that case involved 95 striking employees who effected a "sit-down strike by taking over and holding two of [their employer's] key buildings." *Id.*, at 248 (internal quotation marks omitted). The employees subsequently engaged in "a pitched battle" in which they "resisted the attempt by the sheriff to evict and arrest them." *Id.*, at 249. We held that the NLRA did not condone this conduct, which would "put a premium on resort to force" and would "subvert the principles of law and order which lie at the foundations of society." *Id.*, at 253.

Congress's incorporation of *Fansteel*'s limitation into the NLRA establishes that, while employees have the right to withhold their labor peaceably, subsequent affirmative acts of violence, or seizure of an employer's premises, are not protected labor practices.

2

As a general matter, the dispute in this case is over whether employees can withhold their labor if doing so risks damage to their employer's property. As explained above, by carefully restricting limitations on the right to strike in the NLRA itself, Congress has indicated that the act of peacefully walking off the job is protected strike conduct even if economic harm incidentally results. What is *not* protected is any subsequent affirmative step to destroy or seize the employer's property. This is the statutory backdrop against which the Board has developed the narrow requirement that striking employees must take reasonable precautions before or when they strike in order to forestall or address foreseeable, imminent, and aggravated injury to

_____

decisions of the Board and this Court. See S. Rep. No. 105, 80th Cong., 1st Sess., 28 (1947); *Drivers*, 362 U. S., at 281–282. The three other exceptions concern strikes for illegal objectives, strikes in breach of contract, and strikes in breach of other federal law. See S. Rep. No. 105, at 28.

persons, premises, and equipment that might otherwise be caused by their sudden cessation of work.

The Board first applied this "reasonable precautions" principle to rank-and-file employees in *Marshall Car Wheel & Foundry Co.*, 107 N. L. R. B. 314, 315 (1953), enf. denied on other grounds, 218 F. 2d 409 (CA5 1955). There, employees at a foundry walked off the job at a time when the foundry's furnace was full of hot molten iron, threatening severe damage to the employer's plant and equipment. 107 N. L. R. B., at 315. The Board concluded that the employees' strike conduct was not protected by the NLRA, because the employees had a "duty to take reasonable precautions to protect the employer's physical plant from such imminent damage as for[e]seeably would result from their sudden cessation of work." *Ibid.*

The Board has also applied this principle in other similar cases. It determined, for example, that strikers who walked out of a certain kind of chemical plant—a plant that handled "extremely hazardous" chemicals that were "a hazard not only to employees but also to individuals living in the vicinity"—without shutting down the equipment had engaged in unprotected conduct. *General Chemical Corp.*, 290 N. L. R. B. 76, 77, 83 (1988). Similarly, the Board held that the strike conduct of security guards whose walkout exposed a federal building's occupants to "imminent" danger was not protected by the NLRA. *International Protective Servs., Inc.*, 339 N. L. R. B. 701, 703 (2003).

But the narrow duty that *Marshall Car Wheel* and its progeny impose does not—and cannot—displace the general rule that labor strikes are protected even when the workers' withdrawal of their labor inflicts economic harm on the employer. So the Board has also repeatedly held that employees have no duty to prevent the loss of perishable goods caused by their sudden cessation of work.

In a leading case, employees at a raw poultry plant decided to walk out at 8 a.m. "because by that time all employees

would have reported to work and [the employer] would be in full operation with its largest number of chickens on the line." *Lumbee Farms Coop., Inc.*, 285 N. L. R. B. 497, 503 (1987). The Board affirmed the ALJ's reasoning that "[t]he fact that the strike occurred during the workday when chickens were on the line and vulnerable to loss does not mean employees automatically lost protection under the Act," because "[s]trikers are not required under the Act to institute the strike at a specific time of day." *Id.*, at 506. Indeed, it is "[n]orma[l]" for "planned employee strikes [to be] timed to ensure the greatest impact on an employer." *Ibid.*

The Board has applied this same reasoning in cases involving, for example, cheese and milk. See *Leprino Cheese Co.*, 170 N. L. R. B. 601, 605 (1968); *Central Okla. Milk Producers Assn.*, 125 N. L. R. B. 419, 435 (1959). In those cases, the Board also explained that the reasonable-precautions principle is "*limited* to situations involving a danger of 'aggravated' injury to persons or premises"—a danger "[o]bviously" not posed by the loss of, for example, cheese. *Leprino Cheese*, 170 N. L. R. B., at 607 (emphasis added). The Board has consistently reiterated that "loss is not uncommon when a strike occurs." *Central Okla. Milk Producers*, 125 N. L. R. B., at 435.

In short, it is indisputable that workers have a statutory right to strike despite the fact that exercising that right risks economic harm to employers. Congress has, in effect, drawn a line between those economic harms that are inherent in the act of peacefully walking off the job (which do not render the strike unprotected) and those that result from workers taking subsequent affirmative steps to seize the employer's premises or engage in acts of violence (strike conduct that is not protected by the NLRA). The Board has further recognized a narrow duty that arises if a sudden cessation of work risks foreseeable, imminent, and aggravated harm to persons, premises, or equipment. Beyond this narrow reasonable-precautions requirement, however, employ-

ees have no obligation to protect their employer's economic interests when they exercise the right to withhold their labor.

B

Glacier does not allege that the cement truckdrivers committed acts of violence or seized its plant or property as part of the strike the Union orchestrated. Instead, the thrust of its complaint is that the Union was aware of "the perishable nature of batched concrete," App. 9, and that the drivers' walkout was intentionally timed so as to risk harm to that product. See *id.*, at 10 (alleging "sabotage, ruination and destruction of Glacier's batched concrete").

I agree with the majority that the risk of losing the batched concrete alone would not be sufficient to divest the striking drivers of statutory protection. As Glacier acknowledges, wet concrete is a perishable good. *Ibid.* And the Board has repeatedly reaffirmed that the loss of such perishable goods due to a mere work stoppage does not render a strike unprotected.

There is also no duty to take reasonable precautions to prevent this kind of economic loss, which—standing alone—posed no risk to persons, premises, or equipment, let alone a risk of aggravated harm. While it seems that the drivers were in a position to save the batched concrete that was inside their trucks when the strike was called (by, for instance, continuing to deliver it to the intended customers), that is beside the point. Employees have a protected right to withhold their labor. And it would undercut that right if they could be held liable for the incidental loss of the perishable goods (which includes concrete no less than raw poultry, cheese, or milk) that they tend to as part of their job.[7]

_____

[7] JUSTICE ALITO, relying on the rule from *NLRB* v. *Fansteel Metallurgical Corp.*, 306 U. S. 240 (1939), gleans more from the loss of concrete than either the majority or I do. He concludes that the NLRA's right to strike does not protect the drivers' alleged conduct because Glacier has alleged that the drivers *purposefully* caused the batched concrete to be

JACKSON, J., dissenting

Where I disagree with the majority is the conclusion it draws from the fact that the batched concrete also risked harm to the drivers' trucks, at least as alleged in Glacier's complaint.   The majority repeatedly ties the loss of the concrete—in particular, the risk that it would harden in the trucks—to the alleged risk of harm to the delivery trucks themselves.[8]   But, to me, the alleged risk of harm to Glacier's trucks involves a relatively complex factual analysis under the Board's reasonable-precautions principle.

Glacier alleges that, "[o]nce at rest, concrete begins hardening immediately, and depending on the mix can begin to set within 20 to 30 minutes." *Id.*, at 8.   Its complaint also asserts that "[i]f batched concrete remains in the revolving drum of the ready-mix truck beyond its useful life span, the batched concrete is certain or substantially certain to harden in the revolving drum and cause significant damage to the concrete ready-mix truck." *Id.*, at 9.   But Glacier's own submissions in Washington state court suggest that the Union instructed the drivers to return their trucks to Glacier's yard after the strike began and to keep the ready-mix

————————

destroyed.   In my view, that approach fails to appreciate the distinction *Fansteel* drew between purposefully but peacefully stopping work (and the economic consequences that flow from that decision), which is protected, and taking subsequent, affirmative steps of violence or property seizure, which is unprotected.   To be sure, *Fansteel* would have rendered the drivers' actions here patently unprotected if they had taken the affirmative steps of stealing the trucks, slashing the trucks' tires, or dumping out the concrete after they went on strike.   But nothing like that is alleged in Glacier's complaint.

[8] See, *e. g.*, *ante*, at 781 ("[T]he Union executed the strike in a manner designed to compromise the safety of Glacier's trucks and destroy its concrete"); *ante*, at 783 ("[The drivers] not only destroyed the concrete but also put Glacier's trucks in harm's way.   This case therefore involves much more than 'a work stoppage at a time when the loss of perishable products is foreseeable'"); *ante*, at 785 ("The Union's actions not only resulted in the destruction of all the concrete Glacier had prepared that day; they also posed a risk of foreseeable, aggravated, and imminent harm to Glacier's trucks").

trucks running. See *id.*, at 34, 77. Glacier's submissions also suggest that those precautions actually provided the company's managers and nonstriking employees with sufficient time to decide how to address the situation to prevent any harm to the trucks. See *id.*, at 13, 72, 77, 82–83.

Was any risk of harm to the trucks here "imminent," given the allegation that the Union instructed the drivers to keep the trucks running? Is the risk of concrete hardening in a delivery truck "aggravated," in the way *Marshall Car Wheel* contemplates? Was returning the trucks to the employer's premises and leaving them running a sufficient "reasonable" precaution, because it gave the employer sufficient time to address any risk of harm? Making the call about whether the NLRA protects the Union's conduct raises these questions and others. Importantly, these kinds of questions not only involve making nuanced factual distinctions but also demonstrate that applying the Board's reasonable-precautions precedents is, at bottom, a line-drawing exercise. Under circumstances like these, a court can confidently declare that a union's conduct is not even arguably protected for *Garmon* purposes only where the allegations make out a clear *Fansteel* claim or where the alleged facts implicate a reasonable-precautions case that is directly on point. Because neither is true here, the Court should have concluded that the Union's conduct was at least arguably protected.

Even if the Court's task under *Garmon* were to apply the Board's reasonable-precautions principle to the allegations of Glacier's complaint and decide whether or not the Union engaged in unprotected conduct (to reiterate: that is not the assignment, see Part III–A, *supra*), I cannot agree with the majority's conclusion that the risk to the trucks rendered the drivers' strike unprotected by the NLRA. Instead, I would have credited Glacier's own account, and thus would have concluded that the Union took reasonable precautions when it instructed the drivers to return the trucks and leave them running to avoid the concrete hardening imminently in the

drums. The majority reaches the opposite conclusion by giving far too little weight to the allegation that the drivers returned the trucks, and also by substantially discounting the allegations that support the Union's claim that the drivers left their trucks and revolving drums running. See *ante*, at 784.

Fortunately, the pending Board determination of what actually happened in connection with this particular strike will establish—as a matter of fact and not mere allegation—what precautions (if any) the drivers actually took and what harm (if any) the Union's conduct actually posed to Glacier's trucks.[9] But our different takes on these allegations only underscore the potential for variable outcomes when courts apply the Board's fact-dependent principles to bare assertions.

To the extent that the majority's conclusion rests on the alleged fact that "by reporting for duty and pretending as if they would deliver the concrete, the drivers *prompted the creation* of the perishable product" that "put Glacier's trucks in harm's way," *ante*, at 783, I see nothing aggravated or even untoward about that conduct. Glacier is a concrete-delivery company whose drivers are responsible for delivering wet concrete, so it is unremarkable that the drivers struck at a time when there was concrete in the trucks. While selling perishable products may be risky business, the perishable nature of Glacier's concrete did not impose some obligation on the drivers to strike in the middle of the night or before the next day's jobs had started. To the contrary, it was entirely lawful for the drivers to start their workday per usual, and for the Union to time the strike to put "maximum pressure on the employer at minimum economic cost to the union." *NLRB* v. *Insurance Agents*, 361 U. S. 477, 496 (1960); see also *Lumbee Farms Coop.*, 285 N. L. R. B., at 506.

---

[9] For the same reason, the state court would not be bound by the majority's recitation of the facts at this motion-to-dismiss stage in any future proceedings on this matter in state court.

Nor was the onus of protecting Glacier's economic interests if a strike was called in the middle of the day on the drivers—it was, instead, on Glacier, which could have taken any number of prophylactic, mitigating measures.[10] What Glacier seeks to do here is to shift the duty of protecting an employer's property from damage or loss incident to a strike onto the striking workers, beyond what the Board has already permitted via the reasonable-precautions principle. In my view, doing that places a significant burden on the employees' exercise of their statutory right to strike, unjustifiably undermining Congress's intent. Workers are not indentured servants, bound to continue laboring until any planned work stoppage would be as painless as possible for their master. They are employees whose collective and peaceful decision to withhold their labor is protected by the NLRA even if economic injury results.

\*     \*     \*

Today, the majority fails, in multiple respects, to heed Congress's intent with respect to the Board's primary role in adjudicating labor disputes, despite ostensibly applying *Garmon*, the bedrock case on that issue. The Court's ruling is likely to cause considerable confusion among the lower courts about what *Garmon* requires. And any such confusion not only threatens to encroach upon the Board's prerogatives, as Congress has assigned them, but also risks erosion of the right to strike.

Yet, the posture of this case provides an opportunity to mitigate the results of the majority's errors. On remand,

---

[10] For example, Glacier could have instituted a lockout, see *American Ship Building Co.* v. *NLRB*, 380 U. S. 300, 310 (1965), used nonstriking employees to deliver the batched concrete, or had temporary replacement drivers lined up and ready to go. Glacier was on notice that a strike was possible because the Union was statutorily required to give 60-days advance notice of the proposed termination or modification of the collective-bargaining agreement, § 158(d), and because negotiations had broken down.

the state court should dismiss Glacier's complaint without prejudice or stay its proceedings in view of the General Counsel's complaint. Meanwhile, the Board—which is not bound by the allegations in Glacier's complaint when making its assessment, and is well equipped to make findings of fact concerning the strike conduct at issue—should proceed to determine whether Glacier has interfered with strike conduct that is protected by the NLRA, as alleged by the General Counsel.

Page Proof Pending Publication

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports.  The revised pagination makes available the official United States Reports citation in advance of publication.   The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court.   A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus.   Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation.   The following additional edits were made:

p. 798, line 10, "12" is changed to "11"