J-A06037-24

2024 PA Super 165

| PG PUBLISHING COMPANY, INC. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| PITTSBURGH TYPOGRAPHICAL | : | No. 1035 WDA 2023 |
| UNION #7 (CWA LOCAL 14827), | : | |
| PITTSBURGH NEWSPAPER PRINTING | : | |
| PRESSMEN/PAPER HANDLERS UNION | : | |
| #9 (TEAMSTERS LOCAL 24M/9N), | : | |
| PITTSBURGH MAILERS UNION #22 | : | |
| (CWA LOCAL 14842), NEWSPAPER, | : | |
| NEWSPRINT, MAGAZINE AND FILM | : | |
| DELIVERY DRIVERS, HELPERS AND | : | |
| HANDLERS (TEAMSTERS #205/211), | : | |
| NEWSPAPER GUILD OF PITTSBURGH | : | |
| LOCAL #38061, DON MCCONNELL, | : | |
| CHRISTOPHER V. LANG, JOHN A. | : | |
| CLARK, JR., EDWARD A. BOEHM, | : | |
| ZACHARY L. TANNER AND JOSEPH J. | : | |
| PASS | : | |

Appeal from the Order Entered August 7, 2023
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD-23-002415

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and BECK, J.

OPINION BY BECK, J.:                               **FILED: July 31, 2024**

PG Publishing Company, Inc. ("PG") appeals from the order denying its

motion to permanently enjoin five labor unions and six union-affiliated

individuals (collectively, the "Unions"),[1] from picketing in the parking lot outside a warehouse at Gateway View Plaza ("GVP"), which is property leased by PG to distribute print editions of the Pittsburgh Post-Gazette, a newspaper. The Allegheny County Court of Common Pleas ("trial court") denied the motion on the ground that the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151-169, preempted PG's claim for injunctive relief under state law pursuant to *San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236 (1959). Alternatively, the trial court denied the motion on the ground that it lacked jurisdiction pursuant to the Labor Anti–Injunction Act, 43 P.S. §§ 206a–206t. On appeal, PG contends that the picketing was not peaceful and that the trial court erred by not applying the "local interest" exception to *Garmon* (discussed below). PG also claims that the trial court erred by not applying section 206d(d) of the Labor Anti-

---

[1] The five labor unions represent various PG employees who work in production, distribution, and journalism roles: (1) Pittsburgh Typographical Union #7 ("CWA Local 14827"); (2) Pressmen and Paper Handlers Union #9 ("Teamsters Local 24M/9N"); (3) Pittsburgh Mailers Union #22 ("CWA Local 14842); (4) Newspaper, Newsprint, Magazine, and Film Delivery Drivers, Helpers, and Handlers ("Teamsters #205/211"); and (5) Newspaper Guild of Pittsburgh Local #38061 (the "Guild"). Don McConnell and Christopher V. Lang are the business agents for CWA Local 14827 and Teamsters Local 24M/9N, respectively. John A. Clark, Jr. ("Clark"), Edward Boehm ("Boehm"), and Zachary L. Tanner ("Tanner") are the respective presidents of the CWA Local 14842, Teamsters #205/211, and the Guild. Attorney Joseph J. Pass ("Attorney Pass") is labor counsel for the striking unions.

Injunction Act, which permits courts to enjoin "seizures" of the employer's property. Because the trial court did not err in either respect, we affirm.

The collective bargaining agreements between PG and the Unions expired in 2017.[2] PG and the Unions could not agree on the terms of successor collective bargaining agreements over the next six years. On October 6, 2022, the Unions went on strike and began picketing at PG's facilities across Allegheny County, Pennsylvania.

The Unions first picketed at GVP in November 2022. GVP is a building comprised of warehouse and office space owned by Buncher Company ("Buncher") in Pittsburgh. The building is situated in a large parking lot bordered by West Carson Street and a public sidewalk on the one side and railroad tracks and a river on the other side. The parking lot has one point by which a vehicle can enter from or exit to West Carson Street (the "ingress/egress point").

Buncher leases warehouse space to PG. Buncher posts no trespassing signs throughout the property, including at the ingress/egress point and in the western portion of the property near PG's leased warehouse space. Buncher leases other parts of the warehouse and office space at GVP to other businesses, including an urgent care medical center and a business storage

_____

[2] Unless otherwise noted, the following facts are derived from the trial court's factual findings, all of which are supported by evidence in the certified record. *See generally* Findings of Fact and Conclusions of Law ("F.F. & C.L."), 8/7/2023.

- 3 -

company, both of which are visited by the public. Under the lease agreement, PG has a non-exclusive right to use the common driveways and parking spaces at GVP. Thus, in general, the lessees, including PG, and the lessees' employees and business invitees, have shared access to the parking lot.[3]

PG has continued publishing the Post-Gazette during the strike, in part, by using replacement workers who perform the same duties that the Unions' members performed pre-strike. In total, approximately sixty employees and contractors perform work at GVP on behalf of PG. Twice a week, a replacement driver (identified in the record only as "Freddie") delivered pallets of newspapers to PG's warehouse at GVP in a box truck. Like all vehicles, Freddie's truck enters the parking lot via the ingress/egress point. Freddie drives the truck to PG's loading dock, parks, offloads the pallets into the warehouse, and exits the parking lot via the ingress/egress point. Between 10:00 p.m. and 4:00 a.m., individual carriers driving their personal vehicles enter the parking lot through the ingress/egress point and park in the parking lot near PG's warehouse. The carriers transfer up to 500 newspapers from the warehouse to their vehicles in large metal carts. Once they load the newspapers into their cars and return the carts to the warehouse, the carriers

---

[3] PG also has an exclusive right to use eleven parking spaces from 7:00 a.m. to 6:00 p.m. Monday through Friday. The Unions have not picketed during those times.

exit the parking lot and deliver the newspapers to subscribers across Western Pennsylvania.

The Unions picketed at GVP on the evenings prior to and the mornings of the two days each week that the PG publishes and distributes its print editions. The Unions' picketing has occurred in the parking lot near the ingress/egress point, the loading dock, and the areas where Freddie and the carriers unload/load the newspapers. PG hired the Phillips Group to provide strike security.

Three months after the Unions began picketing at GVP, PG filed a complaint in equity and motion for permanent injunction seeking to enjoin the Unions from "trespassing" on PG's "private property" at GVP. Complaint, 2/22/2023, at 1, 15; *see also id.* at 15 ("[A]ll this action seeks is to exclude the Unions from [PG's] private property."); Motion for Injunction, 2/27/2023, at 3 ("[PG] requests [that the trial court] enjoin the Union and their supporters from trespassing at [GVP] and empower the Sheriff of Allegheny County and all other law enforcement to carry out the order.").[4] PG averred that the Unions destroyed property, blocked ingress and egress to GVP, caused a

_____

[4] At the hearing and on appeal, PG narrowed the scope of its injunction request in terms of location and time. *See* N.T., 6/1/2023, at 22 (requesting a ruling that would limit the striking employees "to the non-work areas during non-work times"); PG's Brief at 13 (maintaining that PG desires an order "prohibiting the Unions from picketing during the Post-Gazette's work times in the ingress/egress point to the west-facing fence of the GVP facility as it is a work area").

vehicle crash on West Carson Street, and threatened physical violence, and that police refused to control the situation and enforce PG's property rights. Complaint, 2/22/2023, at 1, 14; *see also* Motion for Injunction, 2/27/2023, at 1.

On the same day that PG filed its complaint, the Unions filed unfair labor practices charges against PG with the National Labor Relations Board ("NLRB"), asserting that PG had violated employees' rights under section 7 of the NLRA[5] by interfering with and prohibiting picketing in "a portion of common situs property leased" by PG. Unions' Exhibits D-H (five identical NLRB unfair labor practice charges filed against PG).

After the trial court scheduled an evidentiary hearing regarding PG's motion for permanent injunctive relief, the Unions filed preliminary objections pursuant to Pa.R.Civ.P. 1028(a)(1), asserting that the trial court lacked subject matter jurisdiction of the complaint. Under *Garmon*, the Unions claimed that the NLRB, not the trial court, had exclusive jurisdiction to resolve any conflict between the striking Unions' section 7 right to picket and PG's private property rights.

---

[5] *See* 29 U.S.C. § 157 ("Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.").

On June 1, 2023, the trial court heard oral argument on the Unions' preliminary objections. It concluded that it lacked the requisite factual predicate to decide the jurisdictional issue as a preliminary matter and denied the Unions' objections. N.T., 6/1/2023, at 16-17.

Immediately thereafter, the court conducted an evidentiary hearing regarding PG's request for injunctive relief. PG presented the testimony of Robert Weber ("Weber"), PG's Director of Operations, and Officer Joseph Morrison, a City of Pittsburgh Police Officer who provided strike security at GVP through the police department's off-duty secondary employment program. Three of the individual defendants, Clark, Tanner, and Attorney Pass, testified on behalf of the Unions, as well as John Santa ("Santa"), the unit secretary for the Guild. Among other evidence, the parties introduced videos captured by the security force hired by PG for strike protection. *See* PG's Exhibits 4-13, 15-16; Unions' Exhibits A, C.

After receiving briefs submitted by the parties, the trial court issued an order denying PG's motion and dismissing its complaint. Trial Court Order, 8/7/2023, at 1. Concurrently, the trial court issued the following factual findings and conclusions of law.

The Unions were picketing in the parking lot at GVP in PG's working areas while replacement workers were working. F.F. & C.L., 8/7/2023, ¶¶ 47-48. The Unions' goal in doing so was to "slow down [PG's] operation and interfere with the movement of company employees and contractors,"

meaning that the Unions mainly wished to maintain "a presence out there" and to "make things difficult for the [replacement workers, which are colloquially referred to as 'scabs']." *Id.*, ¶¶ 46-47.

Based upon the evidence presented by PG, the trial court made findings concerning ten notable incidents that occurred at the strike site between November 2022 and June 2023:

1.     On November 11, 2022, fifteen to twenty individuals surrounded Freddie in his box truck near the loading dock at GVP. *Id.*, ¶ 26. Members of the Unions parked their cars facing inward towards the warehouse and used the vehicles to "dart" in front of the vehicles driven by PG's replacement workers to "preclude them from entering and exiting the property to perform work duties." *Id.*

2.     On November 24, 2022, a carrier driving eastbound on West Carson Street attempted to drive through the ingress/egress point. *Id.*, ¶ 27.  Picketers congregated in front of the ingress/egress point, causing the carrier to brake and a vehicle traveling westbound on West Carson Street to collide with the carrier's vehicle. *Id.*

3.     On January 11, 2023, Steve Gentille ("Gentille"), a striking member of the Teamsters #205/211, swore at Freddie and banged on the box truck as Freddie was attempting to exit through the ingress/egress point. *Id.* ¶ 28.

4.     On February 4, 2023, Tanner shined a flashlight into a carrier's eyes and Gentille grabbed and shoved the carrier's metal cart. *Id.*

5.     The next night, picketers blocked carriers' vehicles as they attempted to enter and exit GVP's parking lot. *Id.*

6.     On February 8, 2023, union members and leaders, including Tanner, attempted to disrupt Freddie's work by "jeering" while Freddie unloaded papers from his box truck. *Id.*

7.     On February 15, 2023, approximately twenty individuals surrounded Freddie's box truck, parked near the loading dock, as Freddie was attempting to enter the truck. *Id.*  Later that same day, members and leaders of the Unions, including Tanner, closely

surrounded carriers while flashing flashlights towards the carriers' faces and jeering as the carriers were pushing carts full of newspapers. *Id.*

8.      On March 8, 2023, Gentille threw bottles at and jumped into the side of Freddie's truck as Freddie attempted to depart the parking lot. *Id.*

9.      On March 11, 2023, Freddie drove into the parking lot at high rate of speed and almost hit several picketers. *Id.*, ¶ 30. The picketers followed the truck down to the dock and began exchanging words with Freddie. *Id.*, ¶ 31. According to Santa, approximately ten to twelve picketers were present. *Id.*, ¶ 32. Santa observed Freddie get out of the box truck, walk toward the loading dock, turn and walk back to the driver's side, open the door, reach inside the truck, and step down from the truck. *Id.*, ¶ 33. A member of the Teamsters #205/211, Keith Bonar ("Bonar"), was standing near the truck with his hands in his pockets. *Id.*, ¶ 34. Freddie punched Bonar in the face, causing Bonar to bleed. *Id.* Freddie then punched Gentille in the face, breaking his jaw. *Id.*, ¶ 35. Freddie yelled at the striking members of the Unions repeatedly, calling them names and saying, "Who wants some?" *Id.*, ¶ 38. Freddie shoved a union member as the member was walking away. *Id.*, ¶ 30. The strikers walked away from Freddie toward the entrance, but Freddie kept yelling at them and taunting the injured strikers. *Id.*, ¶ 40. According to Weber, Freddie also was injured in this incident, but Weber did not immediately observe any of Freddie's injuries after the altercation, and the company providing strike security for PG noted only Gentille's broken jaw in its incident report. *Id.*, ¶¶ 36, 37, 41.

10.     On March 15, 2023, approximately sixty people blocked the ingress/egress point for almost an hour. *Id.*, ¶ 42. The following month, on April 19, 2023, a crowd blocked the ingress/egress point for an unspecified amount of time, and "nineteen police vehicles responded to the GVP to 'get things under control.'" *Id.*, ¶ 63. Weber acknowledged that some of the individuals were not affiliated with PG, including some that were part of an "anarchy group." *Id.*, ¶¶ 43, 45. Without a connection to PG or the Unions, these individuals had "'no skin' in the parties' labor dispute" and simply had a "main goal of causing chaos." *Id.*, ¶ 45.

After considering these incidents, the trial court determined that PG did not demonstrate that the Unions engaged in violent or destructive conduct or

that it seized PG's operations. The two blockages of the ingress/egress point lasted less than an hour and did not prevent PG from delivering the Post-Gazette on time. *Id.*, ¶¶ 49, 85-87, 97. Moreover, the trial court found, based in part on Weber's testimony, that many of those blocking the ingress/egress point were outsiders not affiliated with the striking employees. *Id.*, ¶ 86.

Regarding property damage, Weber alleged that "a window was broken, nails were left in the parking lot, liquid [was] dropped on carriers' cars that was difficult to remove, and a spike was left underneath the tire" of Freddie's truck, but PG "failed to establish that [the Unions] were responsible for this conduct." *Id.*, ¶¶ 53, 88, 96. Indeed, Weber testified that he had no knowledge about who did these things. *Id.*, ¶¶ 88. The trial court observed that the strikers used "profanity and other colorful language when expressing their displeasure with replacement workers performing their jobs during the strike," but that the Unions' witnesses credibly testified that they "did not cause any property damage" and that they "never had any plans to damage property at the GVP." *Id.*, ¶¶ 51-52, 65.

As for violent behavior, the trial court found that the only violence that occurred during picketing was the March 11, 2023 incident where Freddie, the contract driver for PG, physically assaulted two union members, breaking one of their jaws, and PG failed to establish that the Unions were responsible for the physical altercation. *Id.*, ¶¶ 41, 66, 89.

Turning to whether it could enjoin the Unions from picketing on PG's private property based upon Pennsylvania trespass law, the trial court reasoned that it did not have jurisdiction at this juncture to decide that issue pursuant to **Garmon** because the Unions' picketing was arguably protected by section 7 of the NLRA, giving the NLRB exclusive jurisdiction to balance PG's private property rights with the Unions' section 7 rights. **Id.**, ¶¶ 74-75, 93-94, 99-100. Further, the trial court found that it lacked jurisdiction to issue a permanent injunction involving the parties' labor dispute pursuant to the Labor Anti-Injunction Act as PG failed to establish that the Unions engaged in a seizure of PG's property or other damaging conduct pursuant to 43 Pa.C.S. § 206d(d) to render this case exempt from the Labor Anti-Injunction Act. **Id.**, ¶ 84. Furthermore, PG did not establish any of the five factors listed in section 206i to enable the court to grant the injunction under equitable considerations. **Id.**, ¶ 108; **see also** 43 P.S. § 206i(a)-(f). Accordingly, the trial court entered an order denying PG's request for a permanent injunction.

PG filed a timely notice of appeal. PG and the trial court complied with Pa.R.A.P. 1925. PG raises the following issues for our review:

> 1. Whether the trial court erred as a matter of law in holding that it was without jurisdiction to decide whether the Unions' presence on private property constitutes unlawful trespass and holding that the … NLRB … is exclusively tasked with resolving conflicts between the NLRA rights and property rights?
>
> 2. Whether the trial court erred as a matter of law in failing to make findings with respect to non-striking employees, including Appellee [Attorney Pass], who are without [NLRA] rights, and their presence on [PG] property?

- 11 -

3. Whether the trial court erred as a matter of law in concluding that the Unions' conduct did not amount to a "seizure," other unlawful acts, or property damage and did not trigger an exception to the Pennsylvania Anti-Injunction Act … as set forth at 43 P.S. § 206(d) despite its finding that the ingress and egress was blocked during working times and the delivery of newspapers was delayed?

4. Whether the trial court erred as a matter of law in finding that the [PG] has an adequate remedy at law to address the Unions' conduct and actions?

PG's Brief at 5 (cleaned up; issues reordered for ease of disposition).[6]

## **Standard of Review**

PG's claims assail the trial court's finding that it lacked subject matter jurisdiction pursuant to **Garmon** to decide the trespass claim and denying its request for a permanent injunction. Whether a court has subject matter jurisdiction is a question of law, **Richmond Waterfront Indus. Park, LLC v. Philadelphia Belt Line R.R. Co.**, 313 A.3d 259, 262 (Pa. Super. 2024), as is the question of whether a trial court properly granted or denied a permanent injunction. **Buffalo Twp. v. Jones**, 813 A.2d 659, 664 n.4 (Pa. 2002). We review questions of law under a de novo standard and with a plenary scope of review. **Id.**; **Richmond Waterfront**, 313 A.3d at 262.

A trial court may grant a permanent injunction only when the party seeking the injunction establishes that its right to relief is clear, that the

---

[6] PG also lists the catchall issue of "[w]hether the trial court erred as a matter of law when it denied [PG's] Motion," PG's Brief at 5, but it does not advance any separate arguments in its brief other than the arguments associated with the other issues.

- 12 -

injunction is necessary to avoid an injury that cannot be compensated by damages, and that greater injury will result from denying rather than granting the injunctive relief. ***Kuznik v. Westmoreland Cnty. Bd. of Comm'rs***, 902 A.2d 476, 489 (Pa. 2006). "Ultimately, the grant or denial of a permanent injunction will turn on whether the lower court properly found that the party seeking the injunction established a clear right to relief as a matter of law." ***Buffalo Twp.***, 813 A.2d at 664 n.4. We must accept and defer to the trial court's factual findings if the findings are supported by competent evidence. ***Liberty Place Retail Assocs., L.P. V. Israelite School of Universal Practical Knowledge***, 102 A.3d 501, 506, 506 n.4 (Pa. Super. 2014).

### *Garmon* Preemption

In its first two issues on appeal, PG argues that the trial court erred in concluding that the NLRA preempted its jurisdiction to issue an injunction pursuant to state law. PG's Brief at 20. According to PG, the trial court applied ***Garmon*** in an overbroad and simplistic manner without analyzing whether the NLRA protects the Unions' conduct or whether the conduct constitutes a recognized ***Garmon*** exception. ***Id.*** at 21, 29. Under a proper ***Garmon*** analysis, PG maintains, the trial court should have found that the NLRA does not arguably protect the Unions' activities because striking employees did not have a legal right to picket in working areas during working times, particularly while engaging in non-peaceful conduct. ***Id.*** at 20, 34. As such, PG contends, the trial court erred by not applying the "local interest" exception to ***Garmon*** preemption. ***Id.*** More specifically, PG contends that the Supreme Court of

the United States "extended the local interest exception to cover acts of trespass," holding "that picketing and other activities that occur on private property are proper matters for local concern under a state's trespassing laws." PG's Brief at 27-28 (citing *Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180 (1978)).

As noted above, section 7 of the NLRA protects employees' rights "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 23 U.S.C. § 157. The Supremacy Clause of the United States Constitution provides Congress with the power to preempt state law. U.S. CONST., ART. VI, CL. 2. Under a doctrine known as *Garmon* preemption, "states cannot regulate conduct that the NLRA protects, prohibits, or arguably protects or prohibits." *Glacier NW., Inc. v. Int'l Bhd. Of Teamsters Loc. Union No. 174*, 598 U.S. 771, 776 (2023) (cleaned up). To ensure that the federal labor law scheme operates uniformly as Congress intended, state courts "must defer to the exclusive competence" of the NLRB whenever conduct is actually or "arguably subject" to sections 7 and 8 of the NLRA.[7] *Garmon*, 359 U.S. at 245. When it is not clear whether the activity is subject to the NLRA, "courts are not [the] primary tribunals to adjudicate

---

[7] Section 8 prohibits employers and unions from engaging in "unfair labor practice[s]," including interference with employees' exercise of their section 7 rights. 23 U.S.C. § 158.

such issues." *Garmon*, 359 U.S. at 244-45. Instead, the Supreme Court has held that it is "essential to the administration of the [NLRA] that these determinations be left in the first instance to the [NLRB]." *Id.* In these instances, the state court must take a "jurisdictional hiatus," *Sears*, 436 U.S. at 203, and "await the [NLRB]'s resolution of the legal status of the relevant conduct." *Glacier NW., Inc.*, 598 U.S. at 777. The state court only may resume jurisdiction if the NLRB decides that the NLRA does not protect or prohibit the conduct. *Id.*

Nevertheless, the state court must bear in mind that the initial screening of a preemption claim "requires more than 'a conclusory assertion' that the NLRA arguably protects or prohibits conduct." *Id.* at 776 (quoting *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 394 (1986)). The party asserting preemption must demonstrate that the NLRB could legally decide the case in the party's favor by advancing "an interpretation of the [NLRA] that is not plainly contrary to its language and that has not been authoritatively rejected by the courts or the NLRB." *Int'l Longshoremen's Ass'n,* 476 U.S. at 395. "The party must then put forth enough evidence to enable the court to find that the [NLRB] reasonably could uphold a claim based on such an interpretation." *Id.*

Even if the NLRA arguably protects or prohibits conduct, there are several recognized exceptions to *Garmon* preemption. A state court may resolve a state law claim: (1) if the party raising the claim "lacks a reasonable opportunity to secure a NLRB decision on the legal status of the conduct at

issue"; (2) if "the conduct in question is a merely peripheral concern of the NLRA"; and (3) if the "regulated conduct touches interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, a court cannot conclude that Congress deprived the states of the power to act," commonly known as the "local interest" exception. **Glacier N.W., Inc.**, 598 U.S. at 777 n.1 (cleaned up).

In the instant case, the trial court concluded that it lacked jurisdiction to issue an injunction prohibiting the Unions' picketing in the parking lot of GVP. Because "claims arising out of the labor dispute have already been and continued to be litigated before the NLRB," and because the "NLRB has already assumed jurisdiction over any claims of unfair labor practices" under section 7 of the NLRA, the trial court decided that it was "clear that federal preemption principles appl[ied] to the request for injunctive relief." F.F. & C.L., 8/7/2023, ¶ 76. The trial court determined that it "only ha[d] jurisdiction over acts which touch on the state interest in the maintenance of peace," and although the Unions used "plenty of colorful language," the Unions did not make specific threats or engage in conduct that rose to the level of an unlawful act or implicated the state concern for maintaining the domestic peace. **Id.**, ¶¶ 92, 94, 98.

Regarding PG's claim that the picketers' presence on PG's private property constitutes an illegal trespass, the trial court found that it lacked "jurisdiction to determine whether the Unions' picketing activity is protected under [s]ection 7 of the NLRA," or whether the Unions' conduct constituted an

"unlawful trespass that would take them out of the realm of protected activity under the NLRA." *Id.*, ¶¶ 93-94, 99-100. The trial court concluded that only the NLRB had jurisdiction to decide whether the Unions' picketing activity was protected by section 7 of the NLRA, and, to the extent there was a conflict between the Unions' section 7 rights and PG's private property rights, how both rights may be accommodated. *Id.*, ¶¶ 93-94, 99-100.

Throughout its brief, PG toggles between references to trespassing and allusions to non-peaceful conduct by the Unions, including the "blocking of ingress and egress," "violence," and "property damage." *See* PG's Brief at 2-3, 6, 8-9, 21. To the extent that PG attempts to frame its arguments to include such non-peaceful conduct, it rests its legal contentions upon a foundation of facts that it did not establish before the trial court and that are contrary to the trial court's findings and credibility assessments. *See* F.F. & C.L., 8/7/23, ¶¶ 51, 53, 85, 87, 88, 89, 90, 92, 96, 98. PG does not argue that the trial court's factual findings are unsupported by the record; instead, PG simply ignores the findings that do not serve its legal arguments and seeks for this Court to decide the case based upon PG's preferred factual findings. As an appellate court, we do not have this authority. *See Liberty Place*, 102 A.3d at 506. Because the record supports the trial court's factual findings that the Unions' conduct was wholly peaceful, we must decide the legal question of whether *Garmon* preemption applied within the context of these factual findings.

- 17 -

More specifically, the legal question for our consideration is whether the state court had jurisdiction to decide whether the Unions committed trespass under Pennsylvania law, which inherently involves the question of whether the striking Unions had the legal right to be present in the parking lot of GVP to picket. The Unions have filed unfair labor practice charges with the NLRB alleging that PG interfered with its section 7 right to picket during a strike in areas of PG's property. We agree with the trial court's assessment that picketing by the Unions in the parking lot was at least arguably protected by section 7. The striking Unions' picketing was to protest PG's actions in connection with the dispute between PG and the Unions concerning the terms of their now expired collective bargaining agreements. The parking lot was an area that PG did not have the exclusive right to access, that was accessible to PG's employees and to business invitees of other tenants, that would have been the striking employee's workplace but for the strike, and from where PG produced and distributed newspapers during the strike using replacement workers. None of the cases cited by the parties definitively establish whether the NLRA protects the Unions' activities on PG's property under these circumstances. Whether the section 7 rights ultimately will prevail over the private property rights was not for the trial court to decide at this juncture. *See Garmon*, 359 U.S. at 244-45. The arguably-protected section 7 claim and a state-law trespassing claim both depend upon the striking members' right to be present on the property in the manner and time that they have been present. As such, the trial court correctly decided that it had no

jurisdiction to grant injunctive relief based upon a state-law trespass theory unless or until the NLRB decides that the Unions' activities on the PG's property was not protected. *See id.* at 245 (state courts "must defer to the exclusive competence" of the NLRB whenever conduct is actually or "arguably subject" to sections 7 and 8 of the NLRA); *Sears*, 436 U.S. at 201-03 (finding if the union initiates an unfair labor proceeding with the NLRB raising the issue of whether section 7 protects its activities on an employer's private property, the state court cannot invoke the local interest exception to retain jurisdiction to decide whether the union trespassed on the employer's property).

PG's reliance upon *Sears* in support of its argument is misplaced. By arguing that *Sears* extended the local interest exception to cover trespass, and that state courts may address picketing on private property as a matter of local concern under a state's trespassing laws, PG oversimplifies the holding in *Sears* and fails to capture the nuance of the Supreme Court's preemption analysis. *Sears* is widely cited for the proposition that states have an interest in enforcing local trespass laws that may not be subject to *Garmon* preemption. But a close reading of *Sears* reveals that the Court declined to preempt Sears' trespass claim under more narrow grounds.

In *Sears*, a local union peacefully picketed on privately owned walkways next to a Sears retail store and in the adjacent parking area to protest Sears' failure to source its labor from the union's hiring hall. *Sears*, 436 U.S. at 182. After Sears demanded that the picketers move to a public sidewalk, the union refused to move without legal compulsion **and** declined to file an unfair labor

practice charge asserting its section 7 rights. *Id.* at 183. Sears sought an injunction in state court prohibiting the union's trespass. *Id.* Declaring that ***Garmon*** preemption was inapplicable via the "local interest" exception, the lower court granted the injunction. *Id.* at 183. The California Supreme Court reversed, reasoning that the picketing was arguably protected by section 7 or arguably prohibited by section 8, depending upon the union's purpose, which was a matter that the NLRB should decide. *Id.* at 184. The United States Supreme Court granted certiorari to address the power of state courts to enforce local trespass laws against a union's peaceful picketing. *Id.*

The High Court observed that the legality of the picketing under federal law was unclear, but that the NLRA arguably protected or prohibited the picketing depending upon resolution of a factual inquiry regarding the union's purpose.[8] Nevertheless, even where the NLRA is arguably applicable, the ***Sears*** Court explained that federal preemption may not be warranted if a state "has a substantial interest in regulation of the conduct at issue and [its] interest is one that does not threaten undue interference with the federal

_____

[8] If the NLRB found that the unions picketed to force Sears into assigning work to union members instead of Sears' employees, the picketing was arguably prohibited by section 8(b)(4)(D) of the NLRA. If the NLRB found that the unions were picketing to coerce Sears to agree to hire only union members, the picketing may violate the prohibition on recognitional picketing contained in section 8(b)(7)(C) without a corresponding petition to recognize the union as the representative of the employees. On the other hand, the Court explained, if union's purpose in picketing was solely to publicize that Sears paid its carpenters substandard wages, section 7 may protect the picketing, and Sears may have violated the NLRA when it ordered the unions to stop.

regulatory scheme." *Id.* at 188.  The "critical inquiry" under this "local interest exception," the Court explained, is "whether the controversy presented to the state court is identical to … or different from … that which could have been, but was not, presented" to the NLRB.  *Id.* at 198.  Because federal supremacy is "implicated to a greater extent when labor-related activity is **protected** than when it is **prohibited**," the local interest analysis differs depending on whether the state law clashes with section 7 or section 8.  *Id.* at 200 (emphasis added).

If Sears initiated an unfair labor practice charge claiming that section 8 of the NLRA **prohibited** the Union's actions, the controversy at issue ("whether picketing had an objective proscribed by federal law," regardless of the location) differs from the controversy Sears would present in a state trespass claim (a challenge to the location of the picketing, regardless of purpose).  *See id.* at 197-98.  Thus, under the facts of *Sears*, the federal interest under section 8 may yield to the state's interest in protecting its citizens from trespass on private property, and a trespass claim could proceed in state court.  *Id.*

In contrast, the *Sears* Court recognized that a union's invocation of section 7 protection for its activities on an employer's property has different considerations.  Although an employer retains the ability to obtain immediate injunctive relief for activities that section 7 clearly does not protect, such as violence by strikers or strikers' obstruction of access to the employer's property, section 7 does protect certain conduct that otherwise would violate

state trespass laws. *Id.* at 204. As such, prior to granting relief in a state trespass claim brought by Sears, the Court observed that the state court would have to decide whether section 7 protected the union's activities on the employer's property, "which might entail an accommodation of Sears' property rights and the [u]nion's § 7 rights." *Id.* at 201. This determination squarely overlaps with what the NLRB would decide if the union filed a federal section 7 claim (which it had not). *Id.* "The primary-jurisdiction rationale," the Supreme Court explained, "unquestionably requires that when the same controversy may be presented to the state court or the NLRB, it must be presented to the [NLRB]." *Id.* at 202. Thus, if the union initiates an unfair labor proceeding with the NLRB raising the issue of whether section 7 protects its activities on an employer's private property, the state court cannot invoke the local interest exception to retain jurisdiction to decide whether the union trespassed on the employer's property. *See id.* at 201-03.

Ultimately, despite the arguably protected nature of the union's conduct, the *Sears* Court determined that the primary-jurisdiction rationale did not justify preempting Sears' state law trespass claim because the union refused to file its own section 7 claim to enable the NLRB to decide whether federal law protected its conduct. *Id.* at 202. Notably, even if Sears filed a section 8 claim against the union, the NLRB may decide that section 8(b)(4)(D) or section 8(b)(7)(C) did not prohibit the picketing without reaching the question of whether section 7 protected the picketing, leaving Sears with the quandary of picketing that violated state trespass law but was arguably protected by

federal law. **Sears**, 436 U.S. at 198 n.28. Because the union refused to file a section 7 action before the NLRB, and because Sears was unable to present the protection issue to the NLRB itself, barring Sears from proceeding in state court would render Sears unable to "obtain an orderly resolution of the question of whether the [u]nion had a federal right to remain on its property." **Id.** at 202. Therefore, the Court created an exception to **Garmon** preemption to permit Sears to proceed in state court under a state law trespass theory. **Id.**; **accord Glacier NW., Inc.**, 598 U.S. at 776 (noting that **Garmon** preemption permits state courts to exercise jurisdiction over arguably federally protected conduct if the party "lacks a reasonable opportunity to secure a NLRB decision on the legal status of the conduct at issue").[9]

Applying the reasoning and rationale of **Sears** to the case at bar, because the trial court found the Unions' conduct to be largely peaceful, and

_____

[9] We decline PG's invitation to find persuasive a decision by Maryland's highest court, which relied upon **Sears** to hold that the local interest exception applied to Walmart's action to enjoin a union's protests in and outside its retail stores under state law theories of trespass and nuisance. **See** PG's Brief at 28-29. The Maryland Supreme Court made clear that it was only considering whether the conduct was arguably prohibited by section 8, not whether the conduct was protected by section 7. **United Food & Com. Workers Int'l Union v. Wal-Mart Stores, Inc.**, 162 A.3d 909, 918-19 n.6 (Md. 2017). Additionally, **Wal-Mart** was in a wholly different factual posture than the case at bar: the court was reviewing the trial court's grant of a permanent injunction; the unions were not on strike and did not represent or seek to represent current Wal-Mart employees; and the unions coordinated "flash mobs" that congregated en masse with up to one hundred people in Walmart's retail stores, disrupting customers' shopping with bullhorns and megaphones, blocking access to cash registers, restrooms, the store entrance, and the parking lot entrance with a "human chain" or other methods, and barging into management meetings with a video recorder. **Id.** at 913-15.

the Unions sought resolution from the NLRB to determine whether section 7 of the NLRA protects its activities at GVP, the trial court correctly determined that it lacked jurisdiction to address PG's injunction at this juncture.

Next, PG argues that conduct of "non-employees, such as Attorney Pass, is not preempted by the NLRA," and the trial court erred by not awarding injunctive relief to PG as to Attorney Pass and non-employees. PG's Brief at 31. The trial court found that PG waived any argument as to non-employees in its vague concise statement, as PG failed to explain to whom PG was referencing. Trial Court Opinion, 10/25/23, at 5; **see also** Pa.R.A.P. 1925(b)(4)(ii), (vii). We agree. PG makes no effort to identify or reference any "non-employee" other than Attorney Pass in its concise statement and in its brief.

As for Attorney Pass, PG points only to law concerning an employer's ability to exclude a non-employee union organizer. As legal counsel to the Unions on strike, Attorney Pass' role is not equivalent to a union representative attempting to unionize an employer's workforce. As such, PG has failed to convince us that the trial court erred in concluding that PG failed to establish that Attorney Pass had no right to be present or that he engaged in unlawful acts. **See** Trial Court Opinion, 10/25/2023, at 4-7.

## Labor Anti-Injunction Act

In its third issue, PG argues that the trial court erred by concluding that the Unions' conduct did not constitute a seizure of GVP for purposes of section 206d(d) of the Labor Anti-Injunction Act, even though the trial court found

that "the entrance to the GVP was blocked so that vehicular traffic could not move through the ingress/egress point on two separate occasions." PG's Brief at 32 (quoting F.F. & C.L., 8/7/2023, ¶ 85). PG insists that these blockages constituted a seizure because the Unions forcibly denied PG (including its employees and contractors) free access to GVP for harassment and intimidation purposes, regardless of the short duration. *Id.* at 33 (citing *Giant Eagle Markets Co. v. United Food & Com. Workers Union, Loc. No. 23*, 652 A.2d 1286, 1292 (Pa. 1995); *Wilkes-Barre Indep. Co. v. Newspaper Guild Local No. 120,* 314 A.2d 251 (Pa. 1974); *PG Publ'g Co., Inc. v. Pittsburgh Typographical Union #7 (CWA Loc. 14827)*, 304 A.3d 1227, 1243 (Pa. Super. 2023)). PG likens the Unions' conduct to seizures upheld in other cases, particularly *PG Publ'g*, wherein this Court affirmed the grant of an injunction granted to PG by the Butler County Court of Common Pleas involving the same striking Unions at another site leased by PG earlier in the strike. *Id.*

"Under Section 206d of the [Labor Anti-Injunction Act], the courts of this Commonwealth are generally prohibited from issuing injunctions or restraining orders in cases involving labor disputes. Section 206d, however, does permit a court to issue an injunction in those cases in which striking employees 'seize' an employer's property." *Giant Eagle Markets*, 652 A.2d at 1292; *see also Turner Const. v. Plumbers Loc. 690*, 130 A.3d 47, 68 (Pa. Super. 2015) (noting that if the trial court finds that a seizure occurred, "the remaining requirements and prohibitions imposed by the Act … do not

- 25 -

apply" and the court may grant an injunction "under the traditional rules of equity"). The relevant portion of the seizure exception provides as follows:

> No court of this Commonwealth shall have jurisdiction to issue any restraining order, temporary injunction, or permanent injunction in a case included within this act, except in strict conformity with the provisions of this act … . Provided, however, [t]hat this act shall not apply in any case … (d) [w]here in the course of a labor dispute as herein defined, an employe[e], or employe[e]s acting in concert, or a labor organization, or the members, officers, agents, or representatives of a labor organization or anyone acting for such organization, seize, hold, damage, or destroy the plant, equipment, machinery, or other property of the employer with the intention of compelling the employer to accede to any demands, conditions, or terms of employment, or for collective bargaining.

43 P.S. § 206d(d).

A plurality of our Supreme Court has equated the exceptions listed in section 206d(d) with the local interest exception to federal preemption. ***Altemose Const. Co. v. Bldg. & Const. Trades Council of Philadelphia***, 296 A.2d 504, 514 (Pa. 1972) (plurality). In other words, if the trial court had jurisdiction for ***Garmon*** purposes to enjoin the Unions' conduct based upon a seizure, violence, or the like, it also would have jurisdiction pursuant to section 206d(d). This is because picketing that amounts to a seizure does not "fall within either constitutional, statutory, common law or equitable protection." ***Westinghouse Elec. Corp. v. United Elec., Radio & Mach. Workers of Am. (CIO) Loc. 601***, 46 A.2d 16, 21 (Pa. 1946) ("***Westinghouse I***"). Because we have already concluded that PG's request for an injunction is subject to ***Garmon*** preemption, it follows that the trial

court also lacked jurisdiction to issue an injunction pursuant to the Labor Anti-Injunction Act. Nevertheless, for the sake of completeness, we address PG's arguments regarding seizure, particularly to resolve its argument that **PG Publ'g** governs the outcome of this case.

By way of background, picketing "to advertise the fact that there is a strike in a certain plant and to persuade workers to join in that strike and to urge the public not to patronize the employer" is lawful and cannot be enjoined. **Carnegie-Illinois Steel Corp. v. United Steelworkers of Am. (CIO)**, 45 A.2d 857, 861–62 (Pa. 1946). "But when hundreds of pickets are massed … at a single gate, it is obvious that this force was not mustered for a peaceful purpose." **Id.** Therefore, "prevention of free access to and from an employer's property by mass picketing, even without actual or threatened force or violence, constitutes an illegal seizure prohibited by the Labor Anti-Injunction Act." **Westinghouse Elec. Corp. v. United Elec., Radio & Mach. Workers of Am.**, 118 A.2d 180, 181 (Pa. 1955) ("**Westinghouse II**") (reversing and directing the trial court to enter an order enjoining mass picketing where the number swelled to "three to four hundred" standing "in a shoulder to shoulder formation, many rows deep in front of the entrance, completely obstructing and blocking the entrance" consistently but briefly during shift changes); **see also Westinghouse I**, 46 A.2d at 19-20 (holding that consistent patrol of employer's plant entrances by small or large groups of picketers in such a fashion that made it "impossible for anybody to edge in

without running the gantlet," except for a select few chosen by picketers, was a seizure because it deprived the employer of "the use and enjoyment of the property" to such an extent that it became "utterly valueless"); ***Wilkes-Barre Ind. Co. v. Newspaper Guild Local No. 120***, 314 A.2d 251, 252 (Pa. 1974) (holding that the chancellor erred by concluding that "large numbers of pickets" blocking two entrances of employer's plant for fifteen minutes each morning and a half hour each evening was not a seizure within the meaning of section 206d(d), but ultimately affirming denial of preliminary injunction because the only individuals who did not reach the plant were non-striking employees in confrontation staged by the employer).

That some were successful in breaching the mass picketing to gain access does not mean, in of itself, that a seizure did not occur because concentrating solely on access neglects to consider "any affronts the [person] may have been forced to weather in attempting to enter." ***Giant Eagle Markets***, 652 A.2d at 1292-93. Further, our Supreme Court has cautioned that seizure under section 206d is not relegated to "only … the most extreme situations." ***Id.*** at 1293. But the Court also acknowledged that "isolated instances of the application of force or intimidation do not constitute a seizure." ***Id.*** Incidents of such a "sporadic nature" do not transform the

remainder of the picketing into "a means of influencing labor negotiations through harassment and intimidation." *Id.*[10]

In *PG Publ'g*, this Court addressed whether mass picketing constituted a seizure under section 206d. In that case, shortly after the Unions went on strike and began picketing at various PG facilities, PG contracted with the Butler Eagle, another newspaper company, to provide printing and bundling services. PG was able to print the paper once before the Unions shifted their picketing to Butler Eagle's facility. On the next three nights prior to PG's delivery days, ten to fifteen picketers patrolled the Butler Eagle.

On one of those nights, five to six picketers stood directly in front of the delivery vans trying to exit, with one picketer applying his body weight to the front grille, others pushing and hitting the van, and still another aiming a flashlight at the driver's eyes, while the remaining picketers stood in the residential street. Someone in the van's passenger seat sprayed an unidentified aerosol substance through the van window, causing the picketers to step aside as the van sped away. As a second van attempted to exit, a picketer banged on the driver's side window with his fist and a masked picketer

---

[10] Notably, in *Giant Eagle Markets* and other cases cited by PG, the appellate courts were reviewing a grant of **temporary** injunctive relief, not the denial of **permanent** injunctive relief, which is at issue here. Reviewing the denial or grant of a preliminary injunction requires an appellate court "only to determine if there were any apparently reasonable grounds for the lower court's action," *id.* at 1291, which is a "highly deferential standard of review." *Summit Towne Ctr., Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995, 1000 (Pa. 2003).

threw a metal thermos at the van window twice, causing damage. Picketers stood in the residential street in response to calls to "hold the street," "get in the street," and "don't let him out." *Id.* at 1232. Nevertheless, the second van was able to depart, followed by a red security vehicle. As the security vehicle exited, a picketer threw a sign at the vehicle and dented the side.

Several days after the third night of picketing, PG and the Butler Eagle sought injunctive relief prohibiting mass picketing, obstruction of Butler Eagle's sole ingress/egress point, threats, intimidation, coercion, property damage, and violence. The trial court issued an immediate preliminary injunction ex parte. Following a hearing, the trial court granted PG's request for a permanent injunction, concluding that PG established both a seizure of the property and property damage within the meaning of the section 206d(d) exception. *Id.* at 1233.[11]

Specifically, the trial court found that on all three nights, a seizure or attempted seizure occurred. Picketers positioned themselves in the sole access point leading from the facility to the residential street, temporarily blocking PG's delivery vans from exiting. *Id.* at 1231-32. Additionally, "[p]hotographic, video, and testimonial evidence" established "property damage caused by the picketers' conduct at the Butler Eagle's sole delivery gate," including "indisputable" video footage of picketers throwing objects at

---

[11] Notably, it appears that none of the parties invoked *Garmon* preemption.

and pounding on PG's distribution vans, resulting in broken windows and mirrors. *Id.* at 1237.

In a 2-1 decision, this Court affirmed in part and reversed in part.[12] Regarding the seizure finding, while the record did not clearly establish the duration of picketers' blockages, this Court noted that neither statute nor precedent required a particular length of time to establish a seizure. *Id.* at 1237. Even absent a seizure, this Court was persuaded that the trial court did not err by granting the injunction based upon the evidence of property damage, including record evidence that the union picketers damaged the vans attempting to leave the facility by banging on them, breaking mirrors and

---

[12] The portion of the order that this Court reversed is not pertinent here, as it pertained to constitutional issues associated with the scope of the injunction.

windows, throwing projectiles at the vans, and otherwise causing damage. *Id.* at 1238.[13, 14]

PG fails to persuade us that *PG Publ'g* controls the outcome here. There, the trial court initially issued an immediate temporary injunction ex parte, which limited the scope of the final injunction to picketing over three nights. On each of those nights, the Unions blocked the egress point and engaged in aggressive behavior, chants advertising their intent, and multiple

_____

[13] Judge McLaughlin dissented. From her perspective, PG and the Butler Eagle did not establish a clear right to relief. Judge McLaughlin opined that the brief delays in exiting the facility by a small group of picketers legally did not constitute a seizure because PG and the Butler Eagle were not deprived "of the use and enjoyment of the property so that it becomes utterly valueless to him." *PG Publ'g*, 304 A.3d at 1244 (McLaughlin, J., dissenting).

Judge McLaughlin also was unconvinced that any damage was done "with the intention of compelling the employer to accede to any demands, conditions, or terms of employment, or for collective bargaining," as section 206d(d) requires, because the evidence established that the damage occurred after the spraying of chemicals and in response thereto. *Id.* (quoting 43 P.S. § 206d(d)).

[14] It appears that this Court may have inadvertently referred to an incorrect legal standard in one portion of *PG Publ'g*. This Court stated that it reviewed the trial court's grant of an injunction de novo. *PG Publ'g*, 304 A.3d at 1234. It also deferred to the trial court's factual findings because they were "supported by competent evidence" and affirmed because it discerned "no error in the court's legal conclusion." *Id.* at 1238 (citing *Liberty Place*, 102 A.3d at 505-06). Elsewhere, however, the Court quoted the legal standard applicable to preliminary injunctions and stated that its review confirmed that "the trial court had reasonable grounds to support its finding of a seizure by Appellants." *Id.* at 1235 (quoting *Turner Constr.*, 130 A.3d at 60); *id.* at 1237 (citing *Giant Eagle Markets*, 652 A.2d at 1293).

- 32 -

incidents of property damage. Save for one journalism student, the picketers were all members of the Unions and striking employees of PG.

In contrast here, PG effectively sought to prohibit **all** picketing on PG's leased property, including in areas where it lacked an exclusive right of access. The presentation of evidence included incidents that were scattered throughout months of picketing, with PG's vehicles twice blocked from exiting for a brief period, and many of those responsible for this conduct were non-Union "anarchist" groups who were unconnected with the strike and were present to cause chaos, not to advance the cause of the Unions. As the trial court found, and the evidence of record supports, PG failed entirely to prove that acts of violence and/or property damage committed was conducted by the Unions.

We find no error in the trial court's conclusion that the isolated incidents of picketers briefly blocking the ingress/egress point did not constitute a seizure of PG's property. ***See Giant Eagle Markets***, 652 A.2d at 1293 (noting that "isolated instances of the application of force or intimidation do not constitute a seizure"); ***cf. id.*** (holding that, based upon evidence of a "consistent pattern" of blocked entrances, swarms around customers, and "other acts of terror and intimidation," picketing in grocery store parking lots denied employees and customers free access to the company's property and trial court had "reasonable grounds" to grant preliminary injunction). Thus, we disagree that ***PG Publ'g*** requires reversal of the trial court's determination

that PG did not establish a seizure within the meaning of section 206d(d) in the instant case.

Because the Labor Anti-Injunction Act applies to the instant labor dispute, without exception, any injunction would have to be issued in accordance with the procedures and "very narrow set of circumstances" set forth in 43 P.S. § 206i, not the traditional rules of equity. *See Cleveland Asphalt Inc. v. Coal. for a Fair & Safe Workplace*, 886 A.2d 271, 278 (Pa. Super. 2005); *accord Phar-Mor Inc. v. United Food & Com. Workers Union Loc. 1776, AFL-CIO, CLC*, 660 A.2d 583, 584 (Pa. 1995) (Opinion in Support of Affirmance). The trial court determined that PG did not establish any of the requirements of section 206i(a)-(f). F.F. & C.L., 8/7/2023, ¶ 108. PG leaves this determination unchallenged, choosing instead in its fourth claim of error to argue that the trial court erred by not applying the traditional rules of equity to grant its injunction request because PG has no adequate remedy at law. *See* PG's Brief at 38-39 (quoting *Liberty Place*, 102 A.3d at 505-06 ("To be entitled to a permanent injunction, a party must establish a clear right to relief, and must have no adequate remedy at law, i.e., damages will not compensate for the injury.")). But a court may evaluate a request for injunctive relief under the traditional rules of equity only if the dispute is not subject to the Labor Anti-Injunction Act. *See Turner Const.*, 130 A.3d at 68. Because the Labor Anti-Injunction Act applies to the instant labor dispute, the trial court did not err by not applying the traditional rules of equity.

**Conclusion**

We must defer to the trial court's factual findings that are supported by the record in this fact-laden dispute. *See Liberty Place*, 102 A.3d at 506. Based upon those factual findings, PG did not establish that the Unions caused property damage, engaged in violence, or seized PG's property. The question of whether the Unions were trespassing on PG's property is intertwined with the question of whether the Unions' strike activity was protected under section 7 of the NLRA. *See Sears*, 436 U.S. at 201-03. As such, the trial court did not err by determining that the NLRA preempted PG's request for an injunction premised upon Pennsylvania trespass law. *See Glacier N.W., Inc.*, 598 U.S. at 776-77; *Garmon*, 359 U.S. at 244-45. Likewise, the trial court did not err by finding that the instant dispute was a labor dispute subject to the Labor Anti-Injunction Act and did not fall within the seizure exception in section 206d(d). *See Giant Eagle Markets*, 652 A.2d at 1292-93. Because we conclude that the trial court did not err in denying PG's request for permanent injunctive relief on either ground, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 07/31/2024